

**IT IS ORDERED as set forth below:**

**Date: April 5, 2024**

_James R. Sacca_

_____
**James R. Sacca**
**U.S. Bankruptcy Court Judge**

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | CASE NO. 23-52197-JRS |
| JAMES DAY, | ) | |
| | ) | CHAPTER 13 |
| DEBTOR. | ) | |
| | ) | |
| MARY IDA TOWNSON, | ) | |
| UNITED STATES TRUSTEE | ) | |
| | ) | |
| MOVANT, | ) | |
| | ) | CONTESTED MATTER |
| vs. | ) | |
| | ) | |
| STANLEY J. KAKOL, JR. ESQ., | ) | |
| and LAW OFFICES OF | ) | |
| STANLEY J. KAKOL, JR., LLC, | ) | |
| | ) | |
| RESPONDENT. | ) | |

## ORDER ON MOTION FOR SANCTIONS

Among the major issues in this case is whether an attorney violated

1

the Georgia Rules of Professional Conduct regarding conflicts of interest and limitations on representation by accepting his fee from a prospective home purchaser to file a skeletal Chapter 13 bankruptcy petition for an elderly debtor to invoke the automatic stay to stop a foreclosure – and then do nothing else so that the case could be quickly dismissed - for the sole purpose of buying time so the purchaser, who also selected the debtor's attorney,  could acquire the debtor's home at a fire sale price, which would have cost the debtor substantial equity in the home, and which home the debtor really did not want to sell?  The answer to that question is yes, those Georgia Rules of Professional Conduct were violated by the attorney's conduct on the facts of this case.

The other deficiencies in the attorney's representation of the Debtor in this proceeding are also serious, but generally not in dispute. The Respondents failed to comply with (a) the disclosure requirements in (i) Bankruptcy Rule 2016 regarding disclosure of the fee agreement with the debtor, (ii) Sections 527 and 528 of the Bankruptcy Code regarding obtaining a written agreement with the Debtor for the representation and providing certain information, and (iii) this Court's General Orders and (b) critical signature requirements for a bankruptcy petition that go to whether a petition is authorized or otherwise valid. Respondent acknowledged that his numerous violations of the Bankruptcy Code, Bankruptcy Rules, Local Rules and this Court's General Orders in this case were embarrassing and, in his own words, "made my skin crawl." But this is not the first time Respondents have been disciplined by this Court for these types of violations.

2

This matter is before the Court on the Motion of the United States Trustee for Review and Disallowance of Attorney Fees and for Imposition of Other Sanctions (the "UST's Motion") related to the representation of the Debtor, James Day ("Mr. Day") by Stanley J. Kakol, Jr., Esq., ("Attorney Kakol") and the Law Offices of Stanley J. Kakol, Jr., LLC ("Attorney Kakol's Law Firm" or the "Law Firm"), in the above-captioned case. [Doc. 28; Case no.: 23-52197]. After notice and one request for a continuance at Attorney Kakol's request, the UST Motion came on for an evidentiary hearing on January 11, 2024 (the "Hearing") at which the Court heard testimony from multiple witnesses and was presented with documentary evidence and argument and thereafter received post-trial briefs. After consideration of all matters of record in this case and other matters in which Attorney Kakol has been disciplined by this Court and the State Bar of Georgia, the Court makes the following findings of fact, conclusions of law and disciplinary sanction.

## FACTUAL BACKGROUND

### I.    The Day Bankruptcies

Mr. Day is an 80-year-old widower who now lives alone at his home at 2943 Sugarcreek Lane SE, Atlanta, Georgia 30316 (the "Sugarcreek Home"). Mr. Day spent 41 years working as a union iron worker in Atlanta before retiring. These days though, his mental and physical health have declined.  Sometime before 2020, Mr. Day suffered a heart attack, which has affected his cognitive abilities and slowed his speech. Mr. Day is also still grieving the loss of his wife, Sarah Day ("Sarah"), who passed away on December 28, 2021. He now uses a wheelchair to get

3

around and requires help from some of his family members to accomplish day-to-day tasks.

Mr. Day's stepdaughter, Pamela Matthews ("Ms. Matthews"), testified at the Hearing that she visits Mr. Day about twice a week to dust, clean, and help out with chores. In addition to her visits, she speaks on the phone with Mr. Day two to three times a day to make sure that he has what he needs. Anthony Day, Mr. Day's son, testified at the Hearing that he visits his father almost daily and helps his father pay his bills, makes sure he has enough to eat, and helps out with anything else that his father may need, though sometimes Anthony simply keeps his father company and the two watch sports on television together. Both Anthony Day and Ms. Matthews agreed that since his heart attack Mr. Day sometimes has trouble understanding things, which they said was evident when you speak with him—and was evident to the Court as well based on observing Mr. Day's testimony.

The Sugarcreek Home was solely titled in Sarah's name. In November 2009, she obtained a home equity conversion mortgage (the "Reverse Mortgage") from Reverse Mortgage Funding, LLC, ("Reverse Mortgage Funding") secured by the Sugarcreek Home. The Reverse Mortgage did not require monthly payments of principal and interest, but only the maintenance of taxes and insurance, which makes them more popular among retired, fixed income borrowers. However, because the Reverse Mortgage was solely in Sarah's name, her death – as opposed to missed installment payments—caused a default on the Reverse Mortgage, so the Sugarcreek Home was scheduled for foreclosure on

December 6, 2022. Mr. Day did not realize the Reverse Mortgage provided that the surviving spouse could become the borrower under the loan by merely filling out the necessary paperwork and submitting it to the lender, which would cure the default and stop the foreclosure.

The foreclosure advertisements resulted in Mr. Day receiving a lot of mail and phone calls about his home and the foreclosure. Mr. Day – who was still grieving the death of his wife – testified that the scheduled foreclosure, coupled with the excessive mail and constant phone calls, overwhelmed him because he lived in the home for the last fifteen to twenty years and he had nowhere else to go.

One of the flyers Mr. Day received in the mail was a bright yellow colored piece of paper (the "Flyer") from "Kyle – Local Investor." The Flyer reads in part:

> Hi, Your home appears to be scheduled for foreclosure auction on Tuesday, December 6th. I'd like to help you prevent this foreclosure by buying your home directly from you. I'm prepared to make you a cash offer today! . . . There is still time for me to help, but it's extremely urgent! Please call me today.

"Kyle – Local Investor" turned out to be Kyle Hurst, who worked for CMNC Homes, LLC ("CMNC"). Mr. Day testified that he got involved with CMNC when a different Kyle who worked for the company, Kyle Edwards, personally came by the Sugarcreek Home and told Mr. Day that he could save Mr. Day's home. Mr. Day testified that he signed papers with Kyle Edwards one time, and that he understood that signing the papers would somehow prevent the foreclosure. In reality, Mr. Day

had signed a Contract For the Purchase and Sale of Real Estate (the "Sales Contract") to sell the Sugarcreek Home to CMNC.

The Sales Contract, dated November 15, 2022, listed the seller of the Sugarcreek Home as the "Estate of Sarah Day By Her designated agent James Day" and the Buyer as "CMNC Homes, LLC."[1] The sales price is listed as $142,500, and a separate clause states that "Buyer and Seller agree the purchase price will be the exact payoff amount, plus $2,500. Seller will net exactly $2,500." County records show a tax assessment value of $238,900 for the property in 2022 and a value of $223,900 in 2023.[2] Internet sites, such as Zillow and Redfin, estimate the value of the house to be between $300,000 and $340,00, so the equity in the house was possibly somewhere between $80,000 and $200,000, which was well in excess of the paltry $2,500 offered to Mr. Day by CMNC.

Closing of the sale was set to occur on or before December 31, 2022, but could basically be extended at the discretion of the CMNC. Because this closing date was well after the foreclosure scheduled for December 6, 2022, the Sales Contract also required Mr. Day to personally file for bankruptcy and probate for Sarah's estate to facilitate the sale, and it listed the law firms that Mr. Day was to use to file for probate and bankruptcy – BCD Law for probate and SJK Law for bankruptcy – and

---

[1] The Court questions whether the Contract was enforceable because Mr. Day was not the designated agent of the Estate of Sarah Day on the day he signed the Contract and because the probate proceeding had not yet commenced.

[2] The Court may take judicial notice of the county records as public records. *See Progressive Mt. Ins. Co. v. Middlebrooks*, 805 F. App'x 731 (11th Cir. 2020) (taking judicial notice of state court filings as public records); *see also Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of complaint as public record).

provided that all of the legal fees were to be paid entirely by the buyer, CMNC, even though the attorneys purportedly represented Mr. Day.

It is Attorney Kakol's Law Firm that is listed in the Sales Contract as the law firm that would handle filing bankruptcy for Mr. Day. Attorney Kakol testified that his relationship with Kyle Edwards started a couple of years ago. According to Attorney Kakol, he got a call from two probate lawyers who said they were trying to get a property through a probate process but that there was a foreclosure coming up and the mortgage company would not talk to the heirs. These probate lawyers told Attorney Kakol that they needed more time to complete the probate process and asked if Attorney Kakol could stop the foreclosure sale to give them more time. Attorney Kakol responded that he could because he believed that he could make a good faith argument that the heir who lives in the property has at least an equitable interest in the property. After this initial conversation, Attorney Kakol said that he never dealt with the probate lawyers going forward, but instead dealt with the heirs, and filed bankruptcy to stop the foreclosure.

These probate lawyers allegedly referred Kyle Edwards and CMNC to Attorney Kakol. Six months later Kyle Edwards reached out to Attorney Kakol directly and told him that he had a client, Mr. Day, who needed a foreclosure stopped to get through the probate process. Kyle Edwards asked if Attorney Kakol could stop the foreclosure, and Attorney Kakol responded that he could. Kyle Edwards then explained his relationship with Mr. Day and mentioned that his company, CMNC, had a Sales Contract to purchase the Sugarcreek Home from Mr. Day.

7

Despite being aware of the Sales Contract, Attorney Kakol did not ask to see it and did not lay eyes on it until "well after the fact." *See* Jan. 11, 2024 Hearing at 11:58:42 a.m., *In re James Day (II)*, No. 23-52197 (Bankr. N.D. Ga.). He testified that he did not feel the need to see the Sales Contract because his representation of Mr. Day was to be "limited" to putting Mr. Day into bankruptcy to stop the foreclosure and doing nothing else.

Attorney Kakol testified that after this initial conversation, Kyle Edwards then set up a three way call on November 17, 2022, so that Attorney Kakol could speak to Mr. Day. Kyle Edwards was on the line for the entirety of this conversation with Mr. Day. Attorney Kakol testified that during the conversation he explained to Mr. Day that he was a bankruptcy attorney. He said he asked about Mr. Day's goal – which Attorney Kakol said was apparently to stop the foreclosure – and explained that he could accomplish this by filing a bankruptcy case for Mr. Day under chapter 13. Attorney Kakol testified that he did not think that this goal could be accomplished by non-bankruptcy means. At the end of the call, he said he gave Mr. Day time to ask any questions, but Mr. Day had none. According to Attorney Kakol, this conversation was lengthy and lasted one hour.

At no point during this call or otherwise did Attorney Kakol discuss matters such as Mr. Day's budget or his creditors with the exception of Reverse Mortgage Funding, but even then, there was apparently no discussion of the default that led to a foreclosure and what could be done to cure the default or remedy that situation to permit Mr. Day to retain

the home. Attorney Kakol also did not provide Mr. Day with a copy of the statement of Rights and Responsibilities as required by this Court's General Order 42-2020 nor discuss with Mr. Day what Mr. Day's rights and responsibilities would be as a chapter 13 debtor because Attorney Kakol did not intend for Mr. Day to successfully complete a chapter 13 bankruptcy case. Rather, Attorney Kakol's plan was to file a chapter 13 case to invoke the automatic stay and prevent the foreclosure from taking place, and nothing more, so that CMNC could acquire Mr. Day's home after the case was dismissed for uncured case deficiencies. He did not ask Mr. Day about the Sales Contract, and he did not ask why or even if Mr. Day wanted to sell his home, even though this was obviously a distressed sale situation that bankruptcy filings are designed to prevent.

Attorney Kakol testified that he did not ask these questions because in his mind Mr. Day had already made the decision to sell his home to CMNC, and he did not want to take "too paternalistic" of an approach in his representation of Mr. Day. He further testified that his representation of Mr. Day was limited to stopping the foreclosure, and he alleges he was not hired to evaluate the Sales Contract for Mr. Day or to provide any advice to Mr. Day on whether or not it was a good idea to go through with selling his home to CMNC. But this conversation took place on November 17, 2022, about three weeks before the foreclosure, which is more time than many attorneys have to prepare bankruptcy filings preceding a foreclosure and would have provided Attorney Kakol with more than ample time to explore other options or have a more meaningful discussion with Mr. Day to provide him with real legal advice.

9

It is apparent to the Court from the testimony that to the extent Attorney Kakol asserted that his representation was limited to merely filing a chapter 13 petition for Mr. Day, that was a limitation that was imposed by CMNC and Attorney Kakol rather than a limitation made by or in consultation with Mr. Day. It is also apparent that Attorney Kakol imposed this limitation without discussing other alternatives available to Mr. Day, such as filing a bankruptcy to stop the sale and then attempting to sell the house in a traditional manner to obtain its fair market value—to which Mr. Day would have responded that he did not want to sell the house—or negotiating with Reverse Mortgage Funding about what if anything could be done to have Mr. Day remain in the home—at which time Attorney Kakol would have learned that Mr. Day only needed some help filling out some forms to keep the house and did not need to file bankruptcy at all.

Attorney Kakol also testified that had Mr. Day asked him whether the Sales Contract was fair and equitable and whether going through with the sale was a good idea, he would have ceased his representation of Mr. Day immediately because he is not an expert at valuing properties and determining whether a sales price is reasonable. He testified to this despite his admission that he likely ran a search on Zillow for the Sugarcreek Home at the outset of the case and despite the fact that he is currently a bankruptcy attorney with thirty years of experience who operates what he described as a "complex chapter 13 practice" where he frequently represents homeowners, some of whom sell their home in

10

bankruptcy.[3] He also testified, "I am certainly allowed to limit my law practice. I am not getting involved in looking at the validity or ethical or anything with a contract that was entered into days before I got involved." *See* Jan. 11, 2024 Hearing at 11:59:26 a.m., *In re James Day (II)*, No. 23-52197 (Bankr. N.D. Ga.).[4]

More telling about why Attorney Kakol really did not ask these reasonable questions of Mr. Day about the Sales Contract and thoroughly discuss Mr. Day's options with him was the following testimony from Attorney Kakol:

> I'm certainly not going to take Kyle Edwards' money to get involved in – if he would've said – I would've stopped the train and said wait a second, we have a conflict of interest here. If you don't want to go through with this thing, you need to tell me. So, I would have stopped it right there.

*See* Jan. 11, 2024 Hearing at 12:04:38 p.m., *In re James Day (II)*, No. 23-52197 (Bankr. N.D. Ga.). It was clear that the purpose of the representation in Attorney Kakol's mind was not just to stop a foreclosure sale, but to do so to facilitate a sale to CMNC, without regard to whether it was in Mr. Day's best interest.

Mr. Day testified that he had no recollection of the phone call with Attorney Kakol ever taking place. In fact, he testified that he has never

---

[3] An attorney does not need to be an expert to provide advice in this area. The value of the Sugarcreek Home based on an internet search versus the sale price should have been a sufficient red flag had Attorney Kakol made a minimal effort to properly counsel Mr. Day.

[4] This testimony makes no sense to the Court. Debtors sign mortgages in which they agree to foreclosure upon default and sign installment loan agreements that provide for repossession upon default and Attorney Kakol files bankruptcy cases for those clients to undo the effects of those prepetition agreements.

been on the phone for an hour in his entire life. Based on the entire 10 minutes of testimony the Court heard from Mr. Day, and the two or three minutes of the description of the call provided by Attorney Kakol in his testimony, the Court finds that if Attorney Kakol was on phone with Mr. Day and Kyle Edwards, the conversation would probably not have exceeded five or ten minutes. Mr. Day further testified that he did not know who Attorney Kakol was, had never met him, did not know what he looked like, and did not remember anyone ever explaining anything to him about bankruptcy, a bankruptcy case, or costs.

The Court does not find Attorney Kakol's description of this phone call with Mr. Day and Kyle Edwards to be credible except to the extent that Attorney Kakol probably asked Mr. Day if he wanted him to file a bankruptcy petition or take some action to stop the foreclosure. If Attorney Kakol had asked Mr. Day directly what his goal was, it is clear to the Court after hearing the testimony of Mr. Day that Mr. Day would have unequivocally said "I want to stay in my home." Mr. Day's goal was as simple as that.

Attorney Kakol testified that a paralegal on his staff, Yolanda Hood, also spoke with Mr. Day and Ms. Matthews on the same day as the initial consultation, November 17, 2022. Attorney Kakol testified that paralegals Yolanda Hood and Janice Williams helped Ms. Matthews sign bankruptcy documents for Mr. Day and helped her complete the mandatory credit counseling course for Mr. Day's bankruptcy because Mr. Day did not have a computer, internet access, or access to email.

Mr. Day did not recall this phone conversation with Attorney Kakol's staff either. Ms. Matthews testified that she did in fact electronically sign documents for Mr. Day's bankruptcy. However, she testified that she did not recall speaking with Attorney Kakol or anyone on his staff. She testified that from her recollection, it was Kyle Edwards who reached out to her and asked for her email to send correspondence for Mr. Day since he did not have access to email. According to Ms. Matthews, Kyle Edwards then forwarded her the bankruptcy documents for signature. After asking whether she should sign her own name or her stepfather's name onto the documents, Ms. Matthews did as she was told and signed Mr. Day's name onto each of the documents despite not having a power of attorney or anything else that would allow her to sign her stepfather's name onto the documents.[5] Ms. Matthews signed these documents because she thought she was helping her stepfather. However, she also testified that she never completed any credit counseling in connection with a bankruptcy case for her stepfather, which she said she would have recalled based on her experience with previously taking a required credit counseling course in her own chapter 13 bankruptcy case.

Part of Attorney Kakol's case file, which was produced after order of the Court in connection with the UST's Motion, contained a signature certificate showing that in connection with case number 22-59908 (the

---

[5] Attorney Kakol has been sanctioned in the past for failing to follow the required procedures for having a person sign a document on another's behalf. *See* Show Cause Order at 2–4, *In re Leroy Hill*, No. 07-67074-CRM, (Bankr. N.D. Ga. June 12, 2008), ECF No. 37 and the discussion therein.

"First Day Case"), 13 pages were sent to an email at matthews62@outlook.com, which is Ms. Matthews's email address, and were signed at Ms. Matthews' home address in Griffin, Georgia, on the evening of December 5, 2022. In addition to the petition, Ms. Matthews also electronically signed blank documents, including a declaration for schedules, a statement of financial affairs, a chapter 13 plan, a verification of creditor matrix, a form 122C means test document, and a Rule 2016(b) statement[6] that erroneously indicated the attorney fee was zero dollars, all of which basically means that she was asked to and did sign documents for Mr. Day in advance of the documents even being prepared.[7] Attorney Kakol also produced records that indicate that he received funds in the amount of $1,313 from Kyle Edwards on behalf of CMNC on November 18, 2022, which amount equates to a $313 filing fee for a chapter 13 bankruptcy case and $1,000 of attorney fees.

On December 5, 2022, Attorney Kakol commenced the First Day Case under chapter 13 of the bankruptcy code by filing a seven-page skeletal petition, a form B121 statement of social security number, and a credit counseling certificate. *In re James Day (I)*, No. 22-59908 (Bankr. N.D. Ga.), ECF Nos. 1–3. A list of creditors was not filed. On December 6, 2022, the Court set December 13, 2022, as the deadline for filing a

---

[6] The Rule 2016(b) statement refers to a statement disclosing an attorney's fees that is required to be signed and filed by the debtor's attorney pursuant to Federal Rule of Bankruptcy Procedure 2016. It is sometimes referred to as a form 2030. It will be referred to herein as either a Rule 2016(b) statement or just a 2016(b) statement.

[7] The Court does not want this fact to be overlooked in the many facts, breaches and deficiencies on the part of Attorney Kakol and his office in this case. That Attorney Kakol or his staff had someone sign documents in blank – documents that are supposed to be signed under penalty of perjury - is a gross breach of professional responsibility.

creditor list. Ord. Regarding the List of Creditors, *Id.*, No. 22-59908 (Bankr. N.D. Ga. Dec. 6, 2022), ECF No. 4. The Court also set December 19, 2022, as the deadline to fix other filing deficiencies, such as filing the schedules, the statement of financial affairs, a means test, a plan, payment advices, and the 2016(b) statement. Ord. Setting Deadlines for Debtor to Correct Filing Deficiencies, *Id.*, No. 22-59908 (Bankr. N.D. Ga. Dec. 6, 2022), ECF No. 6. None of these required documents were ever filed with the exception of a late filed 2016(b) statement that was only filed in response to the UST's Motion. Amended Att'y Disclosure Stmt., *Id.*, No. 22-59908 (Bankr. N.D. Ga. Dec. 15, 2023), ECF No. 19.

On December 20, 2022, Reverse Mortgage Funding filed a Motion for Relief from Stay (the "Stay Relief Motion"), which included a copy of the note, security deed, and death certificate for Sarah Day. Motion for Relief from Stay, *Id.*, No. 22-59908 (Bankr. N.D. Ga.), ECF No. 13. According to the Stay Relief Motion, as of December 6, 2022, the unpaid principal balance on the Reverse Mortgage was $140,408.20. It does not appear Attorney Kakol undertook any effort to resolve the Stay Relief Motion. Had he done so, perhaps he could have learned how easy it would have been to help Mr. Day stay in his home. The First Day Case was dismissed on December 30, 2022, for failure to correct filing deficiencies. Ord. Dismissing Case, *Id.*, No. 22-59908 (Bankr. N.D. Ga.), ECF No. 14. The Chapter 13 Trustee's final report and account showed no receipts. Final Rep. & Acct., *Id.*, No. 22-59908 (Bankr. N.D. Ga. Jan. 18, 2023), ECF No. 16.

On February 23, 2023, Attorney Kakol received another call from Kyle Edwards, who stated that Mr. Day's home was set for foreclosure again on March 7, 2023, and that he needed more time to complete the probate and sale process. Kyle Edwards again asked if Attorney Kakol could stop the foreclosure sale, and Attorney Kakol again replied that he could under the exact conditions as the First Day Case.

Attorney Kakol testified that he then got on another phone call with Mr. Day and Kyle Edwards and that nothing had changed from their prior communication. Attorney Kakol testified that he again explained that he was a bankruptcy lawyer and asked if Mr. Day wanted him to file another chapter 13 bankruptcy case to stop the foreclosure sale. According to Attorney Kakol, Mr. Day understood the plan and had no questions. Attorney Kakol also described this second phone call as lengthy, but again Mr. Day had no recollection of this phone call ever taking place. Once again, Attorney Kakol failed to ask Mr. Day any of the basic questions or gather any of the basic information you would expect an attorney to ask or gather prior to filing a chapter 13 case for a debtor.

Attorney Kakol testified that this was the second three-way conversation with himself, Mr. Day, and Kyle Edwards all on the line for the entirety of the conversation. Attorney Kakol testified he never had a conversation with Mr. Day without Kyle Edwards also being on the call. Attorney Kakol also testified that he did not feel the need to meet with Mr. Day face to face or to discuss other options. He testified that he actually felt more confident in pursuing this course of action a second time because the First Day Case had—in his mind—been a success and

16

stopped the foreclosure sale, and it appeared that Mr. Day wanted to pursue this course of action again, although it does not appear Mr. Day was ever counseled on any other courses of action he could take.

On March 6, 2023, Attorney Kakol's Law Firm received $3,939 from Kyle Edwards on behalf of CMNC for three bankruptcy cases to be filed, including a new case for Mr. Day. Attorney Kakol filed another chapter 13 bankruptcy case in Mr. Day's name on March 6, 2023, (the "Second Day Case" and together with the "First Day Case" the "Day Bankruptcies"). Again, there was a seven-page skeletal petition filed, a form B121, and a credit counseling certificate. (ECF Nos. 1–3).

Attorney Kakol testified that his staff again walked Mr. Day or his family members Anthony Day and Ms. Matthews through the credit counseling and signature process.  However, both Ms. Matthews and Anthony Day testified that they never signed anything for the Second Day Case.  They both also testified that they did not complete the credit counseling for the Second Day Case (or the First Day Case, either).

The petition in the Second Day Case appears to have an electronic signature on the signature line, but no signature certificate exists to verify the signature.  An email conversation from Attorney Kakol's staff to the Attorney for the United States Trustee was entered into evidence in which the Attorney for the United States Trustee asked a member of Attorney Kakol's staff whether "any other papers that evidence signatures you obtained" existed because there was no "Signature Certificate" in connection with the Second Day Case. In a response email, a member of Attorney Kakol's staff answered that "[t]here are no

additional papers at this time. There is no Signature Certificate as it did not generate possibly due to the document being closed prematurely." An attorney is required by Bankruptcy Local Rule 5005-7 and General Order 38-2020 to have a document to verify an original signature on a bankruptcy petition, such as an electronic signature certificate.

When confronted with this email exchange and asked whether anyone signed the petition in the Second Day Case, Attorney Kakol pointed to the electronic signature even though it lacks the signature certificate. He stood by his belief that the petition in the Second Day Case was signed, and he testified that he and his staff would not let a case get filed without a signature. However, he also testified that he does not personally review the petitions for signatures in the cases that he files. Instead, he trains his staff to do this, and he believes that they would not file a case without signatures. The fact that no evidence exists that the petition was signed by either Mr. Day or one of his children in the Second Day Case, and that no signature certificate was generated, leads the Court to conclude that it was signed internally by Attorney Kakol or his staff at the direction of Kyle Edwards.[8]

On March 7, 2023, the Court set March 14, 2023, as the deadline to file a list of creditors in the Second Day Case. (Ord. Regarding List of Creditors, ECF No. 5). The list of creditors was never filed. Also on

---

[8] This is another gross violation of professional responsibility. Attorney Kakol has been sanctioned in the past by this Court for failing to obtain proof of signatures. *See* Ord. on U.S. Tr.'s Motion for Sanctions at 2–5, *In re Neil Duelen*, No. 19-69887-PWB (Bankr. N.D. Ga. Mar. 25, 2020), ECF No. 34. and the discussion therein.

March 7, 2023, the Court set March 20, 2023, as the deadline to correct other filing deficiencies. (Ord. for Debtor to Correct Filing Deficiencies, ECF No. 4). Like in the First Day Case, none of these other documents were filed with the exception of the late filed 2016(b) statement filed in response to the UST's Motion. (Att'y Disclosure Stmt., ECF No. 24). The Second Day Case was dismissed on March 30, 2023, for failure to correct filing deficiencies. (Ord. Dismissing Case, ECF No. 14). After the Second Day Case was dismissed, Reverse Mortgage Funding once again commenced foreclosure proceedings on Mr. Day's home for the first Tuesday in May 2023.

## II.    Subsequent Investigation and the UST's Motion

Rachel Scott ("Attorney Scott") is an attorney in the Senior Citizens Law Project at Atlanta Legal Aid. Her office was contacted in April of 2023 by members of Mr. Day's family who were concerned that Mr. Day was being scammed out of his home. Members of Mr. Day's family told Attorney Scott that someone was telling Mr. Day that he had 30 days to move out of his home and that they would give him $2,500 to help pay for his relocation.

After reviewing public records, Attorney Scott discovered that the Sugarcreek Home was covered by the Reverse Mortgage, which became due following Sarah Day's passing. Attorney Scott also found out about the two foreclosures and related chapter 13 bankruptcy cases filed in Mr. Day's name.

She first spoke with Mr. Day on April 10, 2023. She testified that it was immediately clear that Mr. Day was confused and had a limited understanding of what was going on. However, it was clear that Mr. Day did not want to move, did not want to sell his home, and wanted to stay in his home.

Mr. Day told her that someone named Kyle, whom he trusted, came to his home and told him that he would help him stop the foreclosure scheduled for his home. She confirmed that Mr. Day had signed papers with Kyle, but that Kyle had not given Mr. Day copies of what he had signed.[9] He did not think that he had signed a contract to sell his home, and he understood that the document he signed was so that Kyle could help him stop the foreclosure. He had a vague understanding that Kyle filed a bankruptcy to stop the foreclosure, but he did not remember talking to a bankruptcy lawyer, and he did not recognize Attorney Kakol's name at all. In fact, Mr. Day indicated to Attorney Scott that he thought Kyle Edwards was a lawyer and was helping him as a lawyer. Mr. Day also told her he had no recollection of completing pre-bankruptcy credit counseling, which would have been difficult for him to complete given his lack of a computer, smart phone, internet access, and email access.

Attorney Scott visited Mr. Day at his home and verified that he had no computer, no smartphone, no internet, and only a basic flip phone that

---

[9] Both Ms. Matthews and Anthony Day testified that they never saw the Sales Contract in Mr. Day's home amongst his papers. They testified that they would not have let Mr. Day sign the Sales Contract or proceed with selling his home had they been aware of what was going on. Anthony Day eventually saw the Sales Contract ahead of the Hearing and described the sales price as a "scam" and said that had he seen the Sales Contract amongst his father's things he "would have torn it up."

he had difficulty operating. She went through all of the documents that he could find relating to the Sugarcreek Home and the situation that had transpired. He had letters from Reverse Mortgage Funding, notices from the bankruptcy court received in conjunction with his filings, the Flyer that he received from Kyle and CMNC, and other letters from people soliciting him for assistance with the foreclosure. She did not find a copy of the Sales Contract, any correspondence from Attorney Kakol, any copies of bankruptcy documents, or any communications of that nature among his papers.

Among Mr. Day's papers was a letter from Reverse Mortgage Funding explaining that he could submit documents to qualify as a non-borrowing spouse to be able to remain in his home under a HUD program called the Mortgagee Option Election (the "HUD Program"). Attorney Scott explained in her testimony that under HUD guidelines, if a spouse is not named as a borrower on a reverse mortgage loan, they can still be qualified to remain in the home after the death of the borrowing spouse so long as they were married to the borrowing spouse at the time the loan originated, remained living in the home and married to the borrower throughout the reverse mortgage, and maintain property taxes and homeowners' insurance.

Attorney Scott then reached out to Reverse Mortgage Funding to discuss Mr. Day's eligibility for the program. By April 14, 2023, a short time after Attorney Scott was first contacted regarding Mr. Day, Reverse Mortgage Funding put a hold on the foreclosure so that he could be reviewed to see if he qualified for the HUD Program. Attorney Scott sent

in documents including Mr. Day's marriage certificate and proof of homeowner's insurance, and Mr. Day signed an agreement attesting to his understanding of the terms of his obligations. This was submitted to Reverse Mortgage Funding by the end of April of 2023.  By the end of May of 2023, Reverse Mortgage Funding sent confirmation that Mr. Day was approved, and the loan was being assigned to HUD under the HUD Program. Mr. Day now remains in the Sugarcreek Home, and under the HUD Program he may remain in his home so long as he maintains insurance and taxes on the property. The ease with which Attorney Scott was able to halt the foreclosure shows there was simply no valid professional reason that Attorney Kakol could not provide the same services for Mr. Day.  Attorney Kakol said he is not an expert in reverse mortgages, but Mr. Day did not need an expert, he just needed someone to help him. Any attorney in the debt relief business should know that reverse mortgages generally do not require monthly payments so a minimal inquiry would have uncovered a readily curable default, inside or outside of bankruptcy.

After ensuring that the foreclosure was stopped and Mr. Day could remain in his home, Attorney Scott then undertook an investigation of the Sales Contract and all the dealings with Kyle and the attorneys retained for Mr. Day. She called the number on the Flyer and reached Kyle Hurst.  Kyle Hurst told Attorney Scott that he was the first person from CMNC to speak to Mr. Day, and then Kyle Edwards took over to get Mr. Day's home to closing. Attorney Scott then spoke to Kyle Edwards, who confirmed that Mr. Day had signed the Sales Contract to sell his

home to CMNC. He confirmed that he was working on the probate for the estate of Sarah Day through a probate attorney named Howard Delashmit. He also confirmed that he got in touch with Attorney Kakol to file the chapter 13 bankruptcy cases to stop the foreclosures.

Kyle Edwards refused to give her a copy of the Sales Contract or tell her the sales price, but Attorney Scott was able to get a copy of the Sales Contract from Ms. Matthews, who ultimately received a copy when she was copied on an email that Kyle Edwards sent to the probate attorney. Attorney Scott testified that she immediately noticed red flags, such as the low sales price and the clauses that seemed to require Mr. Day to file for probate and bankruptcy with the attorneys to be chosen and paid for by the buyer, CMNC. She testified that this made her concerned about whose interests these attorneys were representing since Mr. Day had told her that he did not want to sell his home. The fact that the Sales Contract specifically listed these attorneys also signaled to her that they may have had a prior relationship with CMNC.[10]

Attorney Scott sent an email to Attorney Kakol on April 13, 2023, requesting a copy of Mr. Day's case file and attached an authorization that Mr. Day had signed. She received no response. She sent a similar email to Howard Delashmit, the probate attorney listed in the Sales Contract. He called her back the same day. She testified that he was forthcoming and willing to speak with her and provide copies of

---

[10] In his testimony, Attorney Kakol offered his opinion that Kyle Edwards put Attorney Kakol's Law Firm in the Sales Contract to show the client that there is a "team involved to help the client."

documents. He indicated that his firm was also the firm to handle the closing of the sales transaction and that he sometimes assisted with the probate process to be able to close on a sale.

After a number of conversations wherein Attorney Scott expressed to Howard Delashmitt her concerns about the potential conflicts of interest involved given that CMNC paid the filing fee and Mr. Day did not want to sell his home, as well as discussions about what she perceived as a low sales price and potential difficulty in getting probate approval at that low sales price without the approval of Sarah Day's heirs, Howard Delashmit indicated that he wanted to withdraw from the probate case. He withdrew and agreed to waive his fees, only asking to be reimbursed for the filing fee that he had advanced, which was $195, to file the probate petition.

On April 26, 2023, Attorney Scott had a call with CMNC representatives including Kyle Edwards and a man named Chris who initially refused to give his last name or provide his contact details. She later surmised that this was Christopher Burrow, the owner of CMNC. Attorney Scott explained to them that her office was assisting Mr. Day with the HUD Program so that he would not be foreclosed on or have to proceed with the sale of his home. She also asked them about walking away and allowing him out of the Sales Contract. They said in order to walk away, they would need to be reimbursed for all of their expenses including the fees that they paid for filing the two bankruptcy cases. When she asked for a breakdown of the cost, they said that they paid $2,616 – the two filing fees of $313 plus a $1,000 attorney fee for each of

the Day Bankruptcies filed by Attorney Kakol.

On May 1, 2023, Attorney Scott sent a follow-up email to Attorney Kakol. She still received no response. This is when she reached out to the United States Trustee.[11]

On the same day, the United States Trustee filed a Motion to Hold Open the Second Day Case to investigate persons who filed the bankruptcy case and provided bankruptcy assistance to Mr. Day (the "Motion to Hold Open"). (ECF No. 18). The Motion to Hold Open provided information about the involvement of Kyle Edwards and CMNC, the absence of an attorney client agreement, CMNC paying the fees as a third-party, and the failure to file the 2016(b) statement. On May 3, 2023, the Court entered an order holding the case open. (Ord. Holding Case Open, ECF No. 22). On May 8, 2023, Attorney Kakol filed a 2016(b) statement incorrectly certifying that Mr. Day paid his attorney fee when it had actually been paid by Kyle Edwards on behalf of CMNC. (Att'y Disclosure Stmt., ECF No. 24).

On June 22, 2023, the United States Trustee issued a request for Attorney Kakol to produce materials including non-privileged information regarding his agreement to represent Mr. Day, the identity of his staff who consulted with Mr. Day, the names of anyone besides Mr.

---

[11] Attorney Scott also testified that in the past several years as property values have increased, Atlanta Legal Aid has seen increased instances of vulnerable homeowners being targeted by predatory investors who are trying to get people to sign sales contracts for way less than what their properties are worth. Many of these clients are seniors who find themselves in desperate situations like Mr. Day, who was facing a foreclosure. They are told that the person is trying to help them. They are then tricked into signing sales contracts for low prices and lose all of the equity in their property.

Day with whom his staff consulted, a statement of services provided to Mr. Day, a copy of his contracts and fee agreements, proof of the source of payment of his fees, information regarding CMNC, and any other information bearing on Mr. Day's allegations and the information provided by Attorney Scott. As with the previous requests, Attorney Kakol did not respond to this request for production either. On July 11, 2023, the United States Trustee filed a Second Motion to Hold the Case Open for a Continued Period because Attorney Kakol had still failed to respond. (ECF No. 25). On September 28, 2023, after it had still received no response from Attorney Kakol, the United States Trustee filed the UST's Motion currently before the Court. (ECF No. 28).

When asked about his months-long failure to respond to both Attorney Scott and the United States Trustee, Attorney Kakol testified that he was short-staffed and neither he nor his employees could get around to responding. Even if true, this does not excuse Attorney Kakol from his lack of professional courtesy to acknowledge the request and discuss an acceptable timetable to respond. But this excuse of being short-staffed is one that Attorney Kakol has given for years to the judges in this Court for his firm's sloppy work and he is apparently still using it.

The UST's Motion was initially scheduled for hearing on November 29, 2023, but Attorney Kakol requested a reset the day before the hearing. The United States Trustee agreed to reset the matter on the condition that Attorney Kakol respond to Attorney Scott's request for client files, respond to the United States Trustee's document request and file a written response to the UST's Motion. These conditions were

memorialized in a hearing notice scheduling the continued hearing for January 11, 2024, and Attorney Kakol's responses to the document requests were due December 13, 2023. (Notice Rescheduling Hearing, ECF No. 30).

On December 14, 2023, one day after the due date, Attorney Kakol's office provided a partial response by email to United States Trustee's inquiry. This was later supplemented on January 8, 2023. In all, Attorney Kakol's office produced a mere 33-page set of papers to the United States Trustee, which is the entirety of the production of documents. On December 15, 2023, Attorney Kakol filed an amended 2016(b) statement disclosing that the actual source of payment of the fee was Kyle Edwards on behalf of CMNC, not Mr. Day. (Amended Att'y Disclosure, ECF No. 34). For the first time, he also filed a 2016(b) statement in the First Day Case disclosing payment of his fee by Kyle Edwards on behalf of CMNC. Amended Att'y Disclosure Stmt., *In re James Day (I)*, No. 22-59908 (Bankr. N.D. Ga. Dec. 15, 2023), ECF No. 19. On December 15, 2023, Attorney Kakol produced the same set of papers, the mere 33-pages, to Attorney Scott in response to her request for the entirety of Mr. Day's case files. The United States Trustee sent communications to Attorney Kakol's staff to confirm that the 33 pages constituted the entirety of the client file, and no other documents have been produced. Attorney Kakol also filed an initial Response to the UST's Motion on December 27, 2023. (ECF No. 39).

The mere 33 pages include no correspondence such as letters or emails with Mr. Day, no correspondence with Mr. Day's adult children,

no correspondence with Kyle Edwards or CMNC, no correspondence with any creditors, no notes about phone calls with Day or others, no notes about meetings with Day or other persons, no print outs with notes of public records searches on Mr. Day's home, no PACER searches for prior or pending cases, no credit reports, no lists of creditors, no lists of assets, no information about income or expenses, no documentation about the residence or the Reverse Mortgage, no client notes about intake, no payment advices, no tax returns, no photo ID or proof of social security number,[12] no draft sets of schedules, no statements of financial affairs, no chapter 13 plans, and no copies of attorney-client agreements. In his testimony, Attorney Kakol acknowledged that he did not have an attorney-client agreement with Mr. Day even though he was required by law to have one pursuant to 11 U.S.C. § 528 given that Mr. Day is an "assisted person" as defined by 11 U.S.C. § 101(3). There is also no documentation of any informed consent signed by Mr. Day detailing that Attorney Kakol's representation was "limited" to solely filing a petition in the Day Bankruptcies as Attorney Kakol described. Attorney Kakol acknowledged that no such written informed consent exists but testified that he acquired Mr. Day's informed consent to the "limited representation" during the aforementioned telephone calls that also involved Kyle Edwards prior to the filing of both of the Day Bankruptcies. He also testified that he does not take notes about his cases or keep notes in client files because he does not need to because of his thirty years of

---

[12] Attorney Kakol has been sanctioned in the past for conduct related to verifying clients' identities. *See* Supplemental Consent Ord. Regarding Att'y Fees at 2–3, *In re Emeka Nwosu*, No. 23-55213-JWC (Bankr. N.D. Ga. Oct. 20, 2023), ECF No. 27 and the discussion therein.

experience as a bankruptcy attorney.[13]

## III.    Attorney Kakol's Other Cases Involving CMNC Homes, LLC

After filing the UST's Motion in the Second Day Case, the United States Trustee discovered and is investigating other cases where Attorney Kakol's fees were paid by CMNC.[14] Following the Hearing, the Court entered an Interim Order requiring Attorney Kakol to "produce all of the case files and documents for bankruptcy cases filed on or after December 1, 2022, by Attorney Kakol or anyone at the Law Offices of Stanley J. Kakol, Jr., LLC, in which Kyle Edwards or CMNC Homes, LLC, had any involvement, including but not limited to cases in which Kyle Edwards or CMNC Homes, LLC, or someone on their behalf, paid Attorney Kakol's attorney fees." (Interim Ord. Regarding U.S. Tr.'s Motion for Sanctions, ECF No. 40).

After Attorney Kakol made the production required by the Interim Order, the United States Trustee filed a Status Report informing the Court that "Attorney Kakol's office provided a list of 25 cases filed on behalf of 19 debtors. . . [and] provided documents and information for debtors other than Mr. Day and Mr. Butler."[15] (Status Rep., ECF No. 43).

---

[13] Regardless of his years of experience as an attorney, this is a very poor practice.

[14] At the Hearing, the United States Trustee identified six other cases where CMNC paid Attorney Kakol's fee. Those cases are: *In re Byrd*, No. 23-52093 (Bankr. N.D. Ga. 2023); *In re Kenyada*, No. 23-52198 (Bankr. N.D. Ga. 2023); *In re Benton*, No. 23-57235 (Bankr. N.D. Ga. 2023); *In re Hudson*, No. 23-58584 (Bankr. N.D. Ga. 2023); *In re Williams*, No. 23-59585 (Bankr. N.D. Ga. 2023); and *In re Hartsell*, No. 23-62018 (Bankr. N.D. Ga. 2024).

[15] In chronological order by filing date, the Cases listed in the Status report, which includes those six cases that the United States Trustee identified at the Hearing and the Day cases, are as follows: *In re Butler (I)*, No. 20-70003 (Bankr. N.D. Ga. 2020); *In re Butler (II)*, No. 20-72176 (Bankr. N.D. Ga. 2021); *In re Antrican*, No. 22-40413 (Bankr. N.D. Ga. 2022); *In re*

The United States Trustee has since identified what appears to be four more CMNC-related cases involving three debtors filed by Attorney Kakol that were not included in the list provided by his office. (Status Rep., ECF No. 43);[16] (Addenda to Status Rep., ECF Nos. 44, 45). In all, 29 cases have been discovered with 22 different debtors including Mr. Day.[17] The United States Trustee also alleged that according to public records, with respect to nine of the debtors, CMNC acquired their properties for approximately $1,054,726 and sold those properties for approximately $2,289,055 collectively, a profit of $1,234,329.[18] *See* (ECF

---

*Fowler*, No. 22-11088 (Bankr. N.D. Ga. 2022); *In re Gutierrez*, No. 22-57866 (Bankr. N.D. Ga. 2022); *In re Jennings*, No. 22-57898 (Bankr. N.D. Ga. 2022); *In re Harmon (I)*, No. 22-58666 (Bankr. N.D. Ga. 2022); *In re Davis*, No. 22-58779 (Bankr. N.D. Ga. 2022); *In re Anderson*, No. 22-59814 (Bankr. N.D. Ga. filed 2022); *In re Slaton*, No. 22-59817 (Bankr. N.D. Ga. 2022); *In re Day (I)*, No. 22-59908 (Bankr. N.D. Ga. 2022); *In re Moore (I)*, No. 22-59917 (Bankr. N.D. Ga. 2023); *In re Butler (III)*, No. 22-60648 (Bankr. N.D. Ga. 2023); *In re Blythe*, No. 22-60652 (Bankr. N.D. Ga. 2023); *In re Maddox*, No. 22-60665 (Bankr. N.D. Ga. 2023); *In re Harmon (II)*, No. 23-51143 (Bankr. N.D. Ga. 2023); *In re Byrd*, No. 23-52093 (Bankr. N.D. Ga. 2023); *In re Day (II)*, No. 23-52197 (Bankr. N.D. Ga. filed Mar. 6, 2023); *In re Kenyada*, No. 23-52198 (Bankr. N.D. Ga. filed Mar. 6, 2023); *In re Moore (II)*, No. 23-53145 (Bankr. N.D. Ga. 2023); *In re Williams (I)*, No. 23-56326 (Bankr. N.D. Ga. 2023); *In re Benton*, No. 23-57235 (Bankr. N.D. Ga. 2023); *In re Hudson*, No. 23-58584 (Bankr. N.D. Ga. 2023); *In re Williams (II)*, No. 23-59585 (Bankr. N.D. Ga. 2023); *In re Hartsell*, No. 23-62018 (Bankr. N.D. Ga. 2024). *See* (Status Rep., Feb. 12, 2024, ECF No. 43). Numerals appearing after a debtor's name in the above case captions indicate a second or third filing by Attorney Kakol for that specific debtor.
[16] The cases identified by the United States Trustee that were not included in the list provided by Attorney Kakol are: *In re Back*, No. 23-57312 (Bankr. N.D. Ga. 2023); *In re Czarnecki (I)*, No. 22-58976 (Bankr. N.D. Ga. 2023); *In re Czarnecki (I)*, No. 23-52149 (Bankr. N.D. Ga. 2023); and *In re Lai*, No. 23-50013 (Bankr. N.D. Ga. 2023). The debtor Gunther Czarnecki also filed a third case pro se under chapter 7. That case is number: 23-55297. *See* (ECF Nos. 43–45).
[17] The Second Addendum to the Status Report does indicate that Attorney Kakol contends his representation of a few of these debtors was independent of any interaction those debtors had with CMNC. (Second Addendum to Rep., ECF No. 45). Those debtors allegedly are Wade Butler, Gunther Czarnecki, and Leonard Henderson.
[18] Those nine debtors are Antrican, Blythe, Czarneki, Davis, Gutierrez, Harmon, Jennings, Lai, and Slaton. *See* (ECF Nos. 43, 44, 45). The United States Trustee attached the records of the Dekalb County Tax Assessor as an Exhibit to the Second Addendum to the Status Report, and those records contain the following annotation next to Yung Lai's sale to CMNC: "doubtful price not FMV." *See* (ECF No. 46).

Nos. 43–45).

Attorney Kakol testified at the Hearing that "but for the work of my law firm, James Day would no longer have a house." *See* Jan. 11, 2024 Hearing at 10:15:15 a.m., *In re James Day (II)*, No. 23-52197 (Bankr. N.D. Ga.). Although the bankruptcy did stop the foreclosure, we know now that bankruptcy was not necessary to accomplish that, and Attorney Kakol made no effort to help Mr. Day stay in his home, which is what Mr. Day really wanted. It is clear to the Court that it was the work of Attorney Scott at Atlanta Legal Aid, not Attorney Kakol, that saved Mr. Day's home.

The Attorney for the United States Trustee stated at the Hearing that the investigation is ongoing, but it appears that the other cases follow the same pattern as the Day Bankruptcies where a skeletal petition is filed, the case is dismissed, and a belated 2016(b) statement is filed after the United States Trustee makes an inquiry. The United States Trustee has filed motions to reopen many of these cases where CMNC paid Attorney Kakol's fee and many of the matters have been transferred to this Court.

At the Hearing, Attorney Kakol testified that he thought the First Day Case was the first one where he accepted a fee from CMNC, but a review of the other cases reveals that is not correct. In fact, at least ten such cases were filed before the First Day Case. Attorney Kakol did acknowledge in his testimony that he has accepted fees from CMNC in other cases but was unable to provide the number of cases or the debtors' names in those cases. At one point, he estimated the number to be

31

between three and eleven cases, but he also later testified that he could have filed as many as fifteen cases where CMNC paid his attorney fee. That estimated number has turned out to be much lower than the correct number really was. Attorney Kakol's untrue testimony about the First Day Case being the first case where he accepted a fee from CMNC, together with the substantial underestimate of the similar CMNC cases and the unbelievable story that Attorney Kakol had two one-hour long conversations with Mr. Day, leads the Court to conclude that Attorney Kakol's testimony about this situation is not credible.

Of the cases thus far identified as cases where CMNC paid Attorney Kakol's fee, two of them were even filed after September 28, 2023, the date of the filing of the UST's Motion putting Attorney Kakol on notice that his conduct in this case was under review in part for accepting fees from CMNC and for potential violation of rules of professional conduct.[19] In each of these two cases, Attorney Kakol filed a timely 2016(b) statement disclosing that his fee was paid by Kyle Edwards. Att'y Disclosure Stmt., *In re Williams*, No. 23-59585-TJ23 (Bankr. N.D. Ga. filed Sep. 30, 2023), ECF No. 4; Att'y Disclosure Stmt., *In re Hartsell*, No. 23-62018-jrs (Bankr. N.D. Ga. filed Dec. 4, 2023), ECF No. 4. These

---

[19] Those two cases are *In re Williams*, No. 23-59585-TJ23 (Bankr. N.D. Ga. filed Sep. 30, 2023); and *In re Hartsell*, No. 23-62018-JRS (Bankr. N.D. Ga. filed Dec. 4, 2023), which was filed after the Hearing on the UST's Motion was initially scheduled to take place before Attorney Kakol requested that the matter be reset. Due to the recency of the filing of the petition and dismissal of *In re Hartsell*, No. 23-62018, the Honorable Lisa Ritchey Craig entered an Order Vacating the Dismissal on January 19, 2024, and the case was reassigned to this Court. This Court held a status conference in the case on January 30, 2024, to inquire about the status of the case. The United States Trustee reported to the Court that according to Cobb County real estate records, CMNC acquired the property on January 16, 2024, three days before the dismissal was vacated.

disclosures were later amended on December 29, 2023, in each case to clarify that the fee was paid by Kyle Edwards on behalf of CMNC. Amended Att'y Disclosure Stmt., *In re Williams*, No. 23-59585-TJ23 (Bankr. N.D. Ga. filed Sep. 30, 2023), ECF No. 17; Amended Att'y Disclosure Stmt., *In re Hartsell*, No. 23-62018-JRS (Bankr. N.D. Ga. filed Dec. 4, 2023), ECF No. 13.[20]

In testimony, Attorney Kakol acknowledged that each case where CMNC paid his filing fee would likely have some of the same errors and deficiencies noted above in the Day Bankruptcies, which he at times brushed off as mere "technical errors" but also admitted made him embarrassed and made his "skin crawl." *See* Jan. 11, 2024 Hearing at 10:24:56 a.m., *In re James Day*, No. 23-52197 (Bankr. N.D. Ga.). He testified that he gets these cases when Kyle Edwards makes the connection with these debtors and a similar formula follows from there: Kyle Edwards calls Attorney Kakol and says he has a client that they are trying to get through probate and that they need to stop the foreclosure

---

[20] The cases involving CMNC are not the first time that Attorney Kakol has failed to timely and accurately complete the required attorney disclosure statements. See Ord. Denying Motion to Reconsider Ord. of Dismissal at 1–3, *In re Larry Black*, No. 07-74822-CRM (Bankr. N.D. Ga. 2007), ECF No. 38; and the discussion therein. See Show Cause Ord. at 1–3, *In re Leroy Hill*, No. 07-67074-CRM (Bankr. N.D. Ga. 2007), ECF No. 37 and the discussion therein. See Motion for Ord. to Show Cause at 1–4, *In re Deborah Williams*, No. 07-68540-MHM, (Bankr. N.D. Ga. 2007), ECF No. 25 and the discussion therein. See Ord. Regarding Tr.'s Motion for Att'y Kakol to Show Cause at 1–9, *In re Patricia H. Willis*, No. 06-61285, (Bankr. N.D. Ga. 2006), ECF No. 75 and the discussion therein. Moreover, on June 2, 2006, Attorney Kakol was barred from filing any case in the Northern District of Georgia for six months. *See* Order Barring Att'y Kakol from Filing in This Court at 1–2, *In re Kimberley Smith*, No. 06-62445-JEM (Bankr. N.D. Ga. 2006), ECF No. 15 and the discussion therein. In preparing that order, the court had "identified a total of 20 cases filed by Attorney Kakol since September 2005 in which he failed to file completed schedules, statements of financial affairs and disclosure statements." *Id.*

sale. Attorney Kakol says he can stop the foreclosure, and then asks Kyle Edwards what he knows about the case. After that, Attorney Kakol, Kyle Edwards, and the debtor then proceed to get on a three-way call, a skeletal petition is filed, and nothing is done thereafter leading to a quick dismissal of the case. Attorney Kakol also testified that he files these cases with no intention of taking any further action in the case because he believes he may "limit" his representation of these debtors to the mere filing of a petition and doing nothing else to represent these debtors in the bankruptcy cases he initiates.

On April 3, 2024, a miscellaneous proceeding was opened to address the other CMNC-related cases involving Attorney Kakol and to allow the United States Trustee the opportunity to investigate the circumstances surrounding the commencement and prosecution—or the lack thereof—of the bankruptcy cases, review the conduct and fees of Attorney Kakol and others in connection with the cases, to file and prosecute pleadings pertaining to these matters, and request sanctions if appropriate. The miscellaneous proceeding is case number: 24-mp-00502.

## IV.  Discussion

The UST Motion was 20 pages long, plus exhibits. It set forth numerous factual allegations and raised violations of various Bankruptcy Code sections, Bankruptcy Rules of Procedure, General Orders of this Court and violations of the Georgia Rules of Professional Conduct and requested that this Court impose sanctions, including "...other appropriate sanctions, such as temporary suspension from practice..." The detailed allegations and relief requested in the Motion were made

before Attorney Kakol even responded to the information requests he had repeatedly ignored. A hearing on the UST Motion was initially scheduled for about two months after the filing of the UST Motion, which was adequate time for Attorney Kakol to respond. The Notice of Hearing on the UST Motion specified that it would be an evidentiary hearing and specifically included "temporary suspension from practice" among the relief sought.

The first hearing scheduled for November 29, 2023, was continued at Attorney Kakol's request until January 11, 2024 – an additional 40 days for him to prepare but to also give him time to produce the information requested more than six months earlier by the United States Trustee and Attorney Scott. The Amended Notice of Rescheduled Hearing scheduling the hearing for January 11, 2024, was served on December 12, 2023, about 30 days before the Hearing. The Amended Notice once again put Attorney Kakol on notice that temporary suspension was among the requested sanctions and very clearly stated in bold lettering that "...**the Court will also consider whether Attorney Kakol's actions violated the Georgia Rules of Professional Conduct, and consider appropriate sanctions for such violations, if any.**"

In his response to the UST Motion which he filed on December 27, 2023, Attorney Kakol asserted that nothing was unethical about CMNC paying his fees, that he had no divided loyalty and that his loyalty was to Mr. Day and not CMNC, so he clearly understood that rules of professional conduct were at issue. At the January 11, 2024 Hearing,

35

Attorney Kakol also argued that he was permitted to limit the scope of his representation under the Georgia Rules of Professional Conduct, so he was clearly aware that was an issue, as well, an issue that he interjected into the proceeding as a defense.

From the filing of the UST Motion to the January 11, 2024 Hearing there was a three and a half month period for Attorney Kakol to prepare for the evidentiary hearing and he never had less than 30 days notice before either of the scheduled hearings. At the January 11, 2024 Hearing, Attorney Kakol was afforded the opportunity to appear in person with counsel,[21] present evidence, including testimony and documents, compel the attendance of witnesses and the production of documents, cross examine witnesses and present argument orally and in writing.

At the conclusion of the Hearing, the Court invited the parties to file post-trial briefs on the issues related to the possible violations of the Georgia Rules of Professional Conduct.  Attorney Kakol retained counsel at that time and filed a post-trial Response to the UST's Motion. (ECF No. 42).  Attorney Kakol argued that he could ethically limit the scope of his representation as he attempted to do in this case and that he could ethically accept payment of his fees from CMNC without violating any rules. The United States Trustee filed a Reply arguing that Attorney Kakol's limited representation violated Georgia Rule of Professional Conduct 1.2 because Attorney Kakol failed to obtain Mr. Day's informed consent to limit the representation and because the representation was

---

[21] Attorney Kakol and his Law Firm chose not to retain counsel for the Hearing.

unreasonable. (U.S. Tr.'s Reply Brief, ECF No. 47).  The United States Trustee also argued that Attorney Kakol's acceptance of fees from CMNC violated Georgia Rule of Professional Conduct 1.8(f) because Attorney Kakol again failed to obtain Mr. Day's informed consent, Attorney Kakol failed to take any measures to protect client confidences, and CMNC's involvement interfered with Attorney Kakol's independence of professional judgment.

Attorney Kakol requested that he be permitted to file a Surresponse, which the Court allowed. (Response to U.S. Tr.'s Reply Brief, ECF No. 48); (Affidavit Regarding Response, ECF No. 49). In the Surresponse, however, Attorney Kakol failed to address the United States Trustee's legal arguments. Instead, he attached multiple affidavits from his staff as well as what were purported to be phone and text message records from his law firm and his staff's personal phones. Attorney Kakol also described a conversation that allegedly took place between him and Christopher Burrow, the head CMNC, about the method that CMNC used to determine the sales price for Mr. Day's home.

The United States Trustee filed an Objection to Attorney Kakol's attempt to supplement the evidentiary record. (ECF No. 50). The Unites States Trustee argued that the Court should not entertain Attorney Kakol's tardy presentation of evidence long after the close of the evidentiary Hearing where Attorney Kakol declined to present phone records into evidence or call his staff to testify. The United States Trustee also argued that much of the new evidence presented by Attorney Kakol constituted inadmissible hearsay.

37

Attorney Kakol then filed a response to the United States Trustee's Objection and a Motion to reopen the case to submit the additional evidence that Attorney Kakol presented in the Surresponse. (ECF No. 51). Attorney Kakol also made an admission of fault in some aspects of the case but stood by his belief that he provided Mr. Day with adequate limited representation and that Mr. Day understood the arrangement. Lastly, Attorney Kakol made a statement of some reforms that he and his Law Firm are undertaking in response to the Day Bankruptcies, such as pledges to limit his practice to traditional bankruptcy cases, to cease accepting fees from CMNC or other third-parties, to undergo training with the Georgia State Bar Law Office Practice Management Program, to attend continuing legal education classes, and to refrain from filing skeletal petitions without an explanation to the Court.[22]

The Court finds that Attorney Kakol's attempt to supplement the evidentiary record through his Surresponse, a filing that was supposed to address legal arguments made by the United States Trustee but did not, and his Motion to reopen the evidence are entirely inappropriate. The UST Motion was filed on September 28, 2023, and the initial hearing was set for November 29, 2023, but was continued until January 11, 2024 at Attorney Kakol's request. Attorney Kakol had ample opportunity to present evidence and testimony and to call witnesses at the Hearing, but he chose to not do so.  In fact, it was the Court who called Attorney Kakol

---

[22] Attorney Kakol filed a Status Update on Reforms and Admission of Fault (ECF No. 54) on April 2, 2024, in which he asserts he has reached out to the State Bar to schedule an appointment for the Law Firm Practice Management Program and that he has taken some additional CLE courses on legal ethics. The Court has considered this in arriving at its disciplinary sanction.

as a witness after he decided not to call any witnesses or present any evidence. He had heard the testimony of the other witnesses in the morning and could have asked the Court to take a break so his staff could arrive to testify, or they could have come down when he was finished to testifying but he chose not to do so. Apparently now regretting his decision, he cannot now seek permission from the Court to file a Surresponse that was supposed to address legal arguments and instead attempt to present additional evidence. Attorney Kakol's attempted presentation of evidence at this stage of the proceeding is not timely, but it is also not appropriate because all or almost all of it is inadmissible hearsay. As such, the Court will grant the United States Trustee's Objection to Attorney Kakol's attempt to supplement the evidentiary record and will deny Attorney Kakol's motion to reopen the case for a further presentation of evidence.

In order to make a ruling on the Objection and the Motion to reopen the evidence, the Court did review the evidence Attorney Kakol attempted to present in his Surresponse, including the phone and text message records, and the affidavits from Attorney Kakol's staff and generally did not find them helpful to the Respondents' case anyway. The text messages purport to be messages sent from members of Attorney Kakol's staff to members of the Day family. The phone records purport to be calls between members of Attorney Kakol's staff and both Anthony and Ms. Matthews. One of the affidavits from a member of Attorney Kakol's staff states that the staff member sent Ms. Matthews documents for signature in connection with the First Day Case. Another affidavit

39

states that a member of Attorney Kakol's staff overheard Attorney Kakol engage in a phone conversation with Mr. Day. None of the additional evidence would change the Court's calculus of the issues addressed below or the facts outlined above. Whether Ms. Matthews thought she was talking to someone from "Kyle's office" or "Kakol's office" is not particularly consequential to the Court's decision.

The phone records appear to list the duration of the calls, and the overwhelming majority of the calls list zero next to duration. Some of the other calls list an insignificant number of seconds next to duration such that the Court is unable to tell whether anyone actually answered the call or whether it went to voicemail. What is perhaps most notable about the phone records is the complete absence of anything proving that Attorney Kakol and Mr. Day engaged in any conversations in either case, let alone for an hour. The lengthiest phone call or message, listed as 0:03:16 in the duration column, which may represent three minutes and sixteen seconds, is with a phone number associated with Ms. Matthews three days before she signed the petition in the First Day Case, a two minute call or voice message to that same number on the day she signed the petition in that case and another 20 second call or voice message in between. With respect to Anthony, the phone records only show a few calls or messages of 30 and 11 seconds, respectively. Further, all of the text message and phone records are from December of 2022. There are no records of any communication between Attorney Kakol and his Law Firm and any members of the Day family in connection with the Second Day Case filed in March of 2023, which supports the Court's conclusion that

the Second Day Case was an unauthorized filing that Attorney Kakol filed at the direction of Kyle Edwards.

With this background, the Court will next address the arguments of the parties and any violations of bankruptcy or professional rules committed by Attorney Kakol and his Law Firm beginning with conflicts of interest.

### a. Conflicts of Interest and CMNC's Interference with Attorney Kakol's Professional Independence

In this case, Attorney Kakol accepted payment of his attorney's fee from a source other than the debtor. While accepting an attorney's fee from a third party is not always impermissible, the third party may have competing interests with the debtor, which can lead to a conflict of interest in the attorney's representation of that debtor. The Georgia Rules of Professional Conduct (the "Georgia Rules") address conflicts of interest, and attorneys are bound by the Georgia Rules, which apply in all actions and proceedings in the Bankruptcy Court.

Georgia Rule 1.7 addresses conflicts of interest generally. It states in part:

> (a) A lawyer shall not represent or continue to represent a client if there is a significant risk that the lawyer's own interests or the lawyer's duties to another client, a former client, or a third person will materially and adversely affect the representation of the client, except as permitted in (b).

*See* Ga. R. Pro. Conduct 1.7(a). Sections (b) and (c) of Georgia Rule 1.7 address when the informed consent of a client may permit a lawyer to represent that client in the face of a conflict. Those sections provide:

41

(b) If client informed consent is permissible a lawyer may represent a client notwithstanding a significant risk of material and adverse effect if each affected client or former client gives informed consent, confirmed in writing, to the representation after: (1) consultation with the lawyer, pursuant to Rule 1.0(c)[23]; (2) having received in writing reasonable and adequate information about the material risks of and reasonable available alternatives to the representation, and (3) having been given the opportunity to consult with independent counsel.

(c) Client informed consent is not permissible if the representation: (1) is prohibited by law or these Rules; (2) includes the assertion of a claim by one client against another client represented by the lawyer in the same or substantially related proceeding; or (3) involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients.

*See* Ga. R. Pro. Conduct 1.7(b), (c).

Informed consent is defined by the Georgia Rules as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." *See* Ga. R. Pro. Conduct 1.0(l).[24]  Further,

---

[23] "'Consult' or 'consultation' denotes communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question." *See* Ga. R. Pro. Conduct 1.0(d).

[24] The comments to the definition of informed consent from Georgia Rules provide in part:

[6] . . . The communication necessary to obtain such consent will vary according to the Rule involved and the circumstances giving rise to the need to obtain informed consent. The lawyer must make reasonable efforts to ensure that the client or other person possesses information reasonably adequate to make an informed decision. Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the

'Confirmed in writing' when used in reference to the informed consent of a person, denotes informed consent that is given in writing by the person, or a writing that a lawyer promptly transmits to the person confirming an oral informed consent. . . If it is not feasible to obtain or transmit the writing at the time the person gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter.

*See* Ga. R. Pro. Conduct 1.0(c).

The comments to Georgia Rule 1.7 elucidate the finer points of the rule and what constitutes a conflict of interest. Pertinent excerpts from the comments on loyalty to a client include:

[1] Loyalty and independent judgment are essential elements in the lawyer's relationship to a client. If an impermissible conflict of interest exists before representation is undertaken the representation should be declined. . .

[2] Loyalty to a client is impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other competing

---

situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives. In some circumstances it may be appropriate for a lawyer to advise a client or other person to seek the advice of other counsel. A lawyer need not inform a client or other person of facts or implications already known to the client or other person; nevertheless, a lawyer who does not personally inform the client or other person assumes the risk that the client or other person is inadequately informed and the consent is invalid. In determining whether the information and explanation provided are reasonably adequate, relevant factors include whether the client or other person is experienced in legal matters generally and in making decisions of the type involved, and whether the client or other person is independently represented by other counsel in giving the consent. Normally, such persons need less information and explanation than others, and generally a client or other person who is independently represented by other counsel in giving the consent should be assumed to have given informed consent.

[7] Obtaining informed consent will usually require an affirmative response by the client or other person. In general, a lawyer may not assume consent from a client's or other person's silence. Consent may be inferred, however, from the conduct of a client or other person who has reasonably adequate information about the matter. . .

*See* Ga. R. Pro. Conduct 1.0, cmt 6 &7.

43

responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. Paragraph (a) addresses such situations. A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, **whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.** Consideration should be given to whether the client wishes to accommodate the other interest involved.

*See* Ga. R. Pro. Conduct 1.7, cmt. 1 & 2 (emphasis added). The comments on conflicts related to a lawyer's own interests and the interests of third parties paying for a lawyer's services also provide helpful insight pertinent to the facts of this case. Those comments state:

[6] The lawyer's personal or economic interests should not be permitted to have an adverse effect on representation of a client. *See* Rules 1.1 and 1.5. If the propriety of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client objective advice. A lawyer may not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed interest.

[10] A lawyer may be paid from a source other than the client, if the client is informed of that fact and gives informed consent and the arrangement does not compromise the lawyer's duty of loyalty to the client. *See* Rule 1.8(f). For example, when an insurer and its insured have conflicting interests in a matter arising from a liability insurance agreement, and the insurer is required to provide special counsel for the insured, the arrangement should assure the special counsel's professional independence. So also, when a corporation and its directors or employees are involved in a controversy in which they have conflicting interests, the corporation may provide funds for separate legal representation of the directors or employees, if

44

the clients give informed consent and the arrangement ensures the lawyer's professional independence.

*See* Ga. R. Pro. Conduct 1.7, cmt. 6 & 10.

Georgia Rule 1.8 addresses conflicts of interest and prohibited transactions, such as transactions where a third-party pays a lawyer's fee. Section (f) of Georgia Rule 1.8 provides:

> (f) A lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client gives informed consent; (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and (3) information relating to representation of a client is protected as required by Rule 1.6.[25]

*See* Ga. R. Pro. Conduct 1.8(f). The comment to section (f) of Georgia Rule 1.8 states:

> [5] Lawyers are frequently asked to represent a client under circumstances in which a third person will compensate the lawyer, in whole or in part. The third person might be a relative or friend, an indemnitor (such as a liability insurance company) or a co-client (such as a corporation sued along with one or more of its employees). **Because third-party payers frequently have interests that differ from those of the client**, including interests in minimizing the amount spent on the representation and in learning how the representation is progressing, **lawyers are prohibited from accepting or continuing such representations unless the lawyer**

---

[25] Georgia Rule 1.6 deals with confidentiality of client information. It reads in part: "(a) A lawyer shall maintain in confidence all information gained in the professional relationship with a client, including information which the client has requested to be held inviolate or the disclosure of which would be embarrassing or would likely be detrimental to the client, unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out the representation, or are required by these rules or other law, or by order of the court." *See* Ga. R. Pro. Conduct 1.6(a).

45

> **determines that there will be no interference with the
> lawyer's independent professional judgment and there
> is informed consent from the client.** *See* also Rule 5.4(c)
> (prohibiting interference with a lawyer's professional
> judgment by one who recommends, employs or pays the
> lawyer to render legal services for another).

*See* Ga. R. Pro. Conduct 1.8, cmt. 5 (emphasis added).

Lastly, Georgia Rule 5.4 addresses the professional independence
of a lawyer. That rule states in part that "[a] lawyer shall not permit a
person who recommends, employs, or pays the lawyer to render legal
services for another to direct or regulate the lawyer's professional
judgment in rendering such legal services." *See* Ga. R. Pro. Conduct
5.4(c).

In this case, the third party from whom Attorney Kakol accepted
his fee had an interest directly adverse to that of Attorney Kakol's
purported client, Mr. Day. "Multiple representation by a lawyer in a
transaction between a buyer and seller has been characterized as the
clearest instance of improper representation of conflicting interests." §
34:12. Conflicting interests—Property transfers, 4 Legal Malpractice §
34:12 (2024 ed.). This impaired Attorney Kakol's loyalty to his client,
interfered with his professional judgment, and materially and adversely
affected his representation of Mr. Day. This is a direct violation of
Georgia Rules 1.7 and 1.8. Attorney Kakol also allowed the third party to
direct or regulate his representation of Mr. Day in violation of Georgia
Rule 5.4.

Specifically, Attorney Kakol violated Georgia Rule 1.7 because he allowed his "own interest" in receiving his attorney's fee from a third party to limit his ability to "consider, recommend or carry out an appropriate course of action" for Mr. Day, which "materially and adversely affect[ed] the representation." *See* Ga. R. Pro. Conduct 1.7(a); Georgia Rule 1.7, cmt. 2. Attorney Kakol's perceived "duties" to the "third person" that paid his fee also "foreclose[d] courses of action that reasonably should [have been] pursued" because Attorney Kakol knew that Kyle Edwards and CMNC did not want Attorney Kakol to take any action that could jeopardize the Sales Contract. *See* Ga. R. Pro. Conduct 1.7; Ga. R. Pro. Conduct 1.7(a), cmt. 2.

Accepting his attorney's fee from Kyle Edwards on behalf of CMNC in Mr. Day's cases without obtaining informed consent, without preventing interference with his independence and professional judgment or the client-lawyer relationship, and without shielding information relating to the representation of Mr. Day also constituted a violation of Georgia Rule 1.8(f) by Attorney Kakol. *See* Ga. R. Pro. Conduct 1.8(f). First, Mr. Day did not provide informed consent to this arrangement. When asked whether anyone explained bankruptcy costs to him, Mr. Day testified that he did not remember that happening. Although it was written in a multipage contract with CMNC that he does not remember signing and which he was not given a copy of, it was clear to the Court that Mr. Day had no idea at all about this arrangement for CMNC to pay his fees for filing bankruptcy. Mr. Day thought an attorney was going to help him save his house, not work with CMNC to sell it for

way less than fair market value. Because he did not understand the arrangement, it was impossible for Mr. Day to provide any informed consent.

Second, this arrangement interfered with Attorney Kakol's independence of professional judgment and with the lawyer-client relationship. As discussed in more detail below, had Attorney Kakol maintained independence of judgment, he could have recommended alternative strategies for Mr. Day including strategies to save Mr. Day's home, but the arrangement in this case prevented that from happening because Kyle Edwards and CMNC did not want Mr. Day to keep his home.

Lastly, while it is unclear whether any confidential client information was divulged, Attorney Kakol took absolutely no steps to ensure protection of such information. The client-lawyer relationship in this case was completely tarnished by the fact that Kyle Edwards participated in every single alleged phone call or interaction that Attorney Kakol allegedly had with Mr. Day.

Notably, an attorney must comply with all three of the requirements in Georgia Rule 1.8(f) in order to accept a fee from a third party. *See* Ga. R. Pro. Conduct 1.8(f). Attorney Kakol has not even complied with one of the requirements, much less all three. Because Attorney Kakol failed to comply with even a single requirement in Georgia Rule 1.8(f), his acceptance of a fee from CMNC violated Georgia Rule 1.8(f) for three separate reasons.

Attorney Kakol also allowed the third-party payer to regulate his professional judgment in rendering legal services in violation of Georgia Rule 5.4. In his own testimony, Attorney Kakol admitted that every time he filed a new bankruptcy case for Mr. Day, he did so at the initial invitation of Kyle Edwards at CMNC. In each instance, Kyle Edwards reached out to Attorney Kakol and asked if he could file a bankruptcy to stop a foreclosure. Each time, Kyle Edwards allegedly set up a three-way call with Attorney Kakol and Mr. Day and he remained on the line for the entire call. Kyle Edwards "drove the train" in these cases. Attorney Kakol was aware that CMNC had an interest in purchasing Mr. Day's home, and if Attorney Kakol actually provided competent representation to Mr. Day and helped him keep his home, Kyle Edwards would not have been happy and would probably not send any further cases to him. With those considerations at the front of his mind, Attorney Kakol allowed Kyle Edwards to "direct or regulate" his "professional judgment in rendering legal services" to Mr. Day in violation of Georgia Rule 5.4. *See* Ga. R. Pro. Conduct 5.4(c).

Attorney Kakol argues that accepting his attorney's fee from CMNC to represent Mr. Day did not present a conflict of interest because both CMNC and Mr. Day had an aligned interest in stopping the foreclosure of the Sugarcreek Property. However, the case is not that simple and, as discussed above, the positions of buyer and seller in a real estate contract represents the classic conflict of interest. CMNC had an interest in acquiring Mr. Day's home at an unreasonably low price. CMNC's ultimate goal or interest was not for Mr. Day to file bankruptcy to prevent

49

foreclosure on his home. The filing was merely a means to achieve the ultimate goal of acquiring Mr. Day's home for a fraction of its value and to profit at the elderly gentleman's expense. Attorney Kakol knew or should have known that and did nothing to adequately counsel Mr. Day on his options to save his home.

Mr. Day on the other hand had zero interest in selling his home. His interest was in keeping his home. Attorney Kakol testified that Mr. Day's signing of the Sales Contract proved that Mr. Day and Kyle Edwards had an aligned interest in going through with a sale of Mr. Day's home. The Court disagrees, but even if it were true that at some point Mr. Day felt forced to sell his home to CMNC for well below market value, bankruptcy is a tool in the lawyer's toolbox to avoid such situations and to protect a debtor so that he does not feel forced to sell his property at a fire sale price. But by never asking the typical questions a debtor's attorney would ask a client in Mr. Day's situation, it is apparent that Attorney Kakol was solely advancing the interests of CMNC and not the interests of Mr. Day. A conflict existed, and Attorney Kakol had divided loyalties between his client and the third party that paid his attorney fee.

While a "possible conflict does not itself preclude the representation . . . **the critical questions are the likelihood that a conflict will eventuate** and if it does, whether it will materially interfere with the lawyer's professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." *See* Ga. R. Pro. Conduct 1.7, cmt. 2 (emphasis added). This case presented more than a possibility of conflict. It involved an actual conflict

of interest because Mr. Day and CMNC were opposite parties to a contract. The Court also finds that Mr. Day never wanted to sell his home and that a conflict between the interests of Mr. Day and CMNC existed from the start. However, even assuming that Mr. Day felt forced to sell his home, the likelihood that Mr. Day would change his mind had he been adequately counseled about all of his options was incredibly high. Georgia Rule 1.7 makes clear that lawyers should not undertake a representation under those circumstances if the conflict would materially interfere with the lawyer's judgment.

In Attorney Kakol's Response filed on March 15, 2024 [Doc. 51], Attorney Kakol presented his options as a binary choice between either allowing Mr. Day's home to be foreclosed or taking the course of action that Attorney Kakol chose to take – filing the chapter 13 cases for Mr. Day before abandoning him. He asked rhetorically:

> What would the United States Trustee really expect me to do? – tell James Day that I could not help him and watch him lose his home to foreclosure? I am not that cold. . . . I refuse to help you. Go lose your house.

This entirely misrepresents the actual facts and context of the situation. Recall that Attorney Kakol first spoke with Mr. Day on November 17, 2022, about three weeks before the foreclosure was scheduled. That is three weeks of time during which Attorney Kakol could have adequately counseled his client or send Mr. Day to another attorney who would adequately counsel him. Attorney Kakol was not between a rock and a hard place where the only options were to either allow the foreclosure to proceed or file a bankruptcy case and subsequently abandon Mr. Day. As

51

noted above, following the filing of the chapter 13 case, alternative courses of action could have included attempting to sell Mr. Day's home in a traditional manner to obtain its fair market value, negotiating with Reverse Mortgage Funding, or filling out the paperwork for the HUD Program that allowed Mr. Day to remain in his home. Put simply, Attorney Kakol could have done his job and represented Mr. Day in a chapter 13 bankruptcy case. If Attorney Kakol felt incompetent—or conflicted—to perform these tasks, he also could have referred Mr. Day to another attorney to help Mr. Day before or after filing the bankruptcy cases.

So, what could Attorney Kakol have done? He could have fulfilled his obligations under the Georgia Rules and either provide adequate representation of Mr. Day or assist him by finding someone else who would do it. But his Response highlights the problem – he was prevented from providing meaningful representation for Mr. Day because of the conflict of interest he found himself in. Why did he feel like he could not help Mr. Day? Obviously because it would have put him adverse to the interests of CMNC. Filing a chapter 13 case to prevent the foreclosure could have been the beginning of a course of action to achieve Mr. Day's goal of keeping his home. However, under the circumstances of this case, that was not an option for Attorney Kakol because he answered to CMNC because it paid to Attorney Kakol the fees and costs of the Day Bankruptcies, and CMNC had no interest in Mr. Day completing a bankruptcy case or keeping his home. Attorney Kakol's "professional judgment in considering alternatives" was materially interfered with and precluded him from asking questions, contacting Reverse Mortgage

52

Funding or using a bankruptcy case to explore ways to keep Mr. Day's home because CMNC paid his attorney's fees. *See* Ga. R. Pro. Conduct 1.7, cmt. 2.

Attorney Kakol himself testified that he was not going to take money from Kyle Edwards and CMNC to get involved in figuring out whether or not Mr. Day actually wanted to or should sell his home. To quote his testimony again,

> I'm certainly not going to take Kyle Edwards' money to get involved in – if he would've said – I would've stopped the train and said wait a second, we have a conflict of interest here. If you don't want to go through with this thing, you need to tell me. So, I would have stopped it right there.

*See* Jan. 11, 2024 Hearing at 12:04:38 p.m., *In re James Day (II)*, No. 23-52197 (Bankr. N.D. Ga.). This is an acknowledgement of the conflicted interests of Mr. Day and CMNC or at least the high likelihood of a conflicted interest eventuating. More troubling, it is also an admission that the interest of CMNC prevented Attorney Kakol from "consider[ing], recommend[ing] or carry[ing] out an appropriate course of action for the client because of [his] other competing responsibilities [to CMNC] or interests [in receiving his fee]." *See* Ga. R. Pro. Conduct 1.7, cmt. 2.

If Mr. Day had paid Attorney Kakol's fee and met with him privately as opposed to with Kyle Edwards present, Attorney Kakol would have perhaps felt free to ask Mr. Day if he in fact wanted to sell his home. Upon learning that he did not wish to sell his home, Attorney Kakol would have been free to pursue an appropriate course of action to try to save the home. Instead, Attorney Kakol intentionally put his head

53

in the sand and did not ask Mr. Day if he actually wanted to sell his home because Attorney Kakol feared that Mr. Day's answer could present a conflict with CMNC, which would blow up the entire arrangement and cause Attorney Kakol to miss out on his $1,000 fee in this case and maybe others.

Attorney Kakol argues that Mr. Day signed the Sales Contract before he got involved and that he was not hired to evaluate whether or not going through with the Sales Contract was a good idea for Mr. Day. If that is correct, that is precisely the problem. CMNC hired Attorney Kakol to file this bankruptcy case for Mr. Day, and CMNC "direct[ed]" the representation and Kyle Edwards was present every time that Attorney Kakol had contact with Mr. Day, which had the effect of "regulat[ing]" his "professional judgment." *See* Ga. R. Pro. Conduct 5.4(c). Of course, CMNC would not want to hire an attorney for their seller who would evaluate a Sales Contract with an unconscionable sales price potentially $100,000 or more below market value. CMNC had no interest in finding an attorney who would competently represent Mr. Day in a bankruptcy case because that would have resulted in Mr. Day keeping his home. Instead, CMNC wanted to find an attorney who was willing to put a debtor in bankruptcy and abuse the bankruptcy system as a tool to help CMNC acquire Mr. Day's home for cheap, and that is exactly what these bankruptcy cases were used for, until Attorney Scott got involved and saved Mr. Day's home.

In the face of this glaring conflict of interest, there is also no evidence of any consent, much less informed consent, from Mr. Day.

There is no evidence that Attorney Kakol provided "reasonable and adequate information about the material risks of and reasonable available alternatives to the representation." *See* Ga. R. Pro. Conduct 1.7(b). There is also no evidence of any writing whatsoever even though the above information was required to be in writing and informed consent for conflicts in general is required to be confirmed in writing. *Id.* Lastly, nothing at all indicates that Mr. Day was given an opportunity to consult with independent counsel. *Id.* The plan of attack seems to have been to simply ignore the conflict altogether instead of explaining it to Mr. Day and obtaining informed consent. The Georgia Rules do not permit this.

### b. Limitation on Representation

Attorney Kakol argues that his arrangement with Mr. Day was permissible because he limited his representation such that his only involvement would be to file the petition and do nothing more. The Georgia Rules also address limitations of representation by attorneys. Section (c) of Georgia Rule 1.2 states that "[a] lawyer may limit the scope and objectives of the representation if the limitation is reasonable under the circumstances and the client gives informed consent." *See* Ga. R. Pro. Conduct 1.2(c). Like the Georgia Rules on conflicts, Georgia Rule 1.2 on scope of representation requires client informed consent. However, unlike the Georgia Rules on conflicts, Georgia Rule 1.2 does not require that client informed consent be in writing or confirmed in writing. Also, "'[r]easonable' or 'reasonably' when used in relation to conduct by a lawyer denotes the conduct of a reasonably prudent and competent lawyer." *See* Ga. R. Pro. Conduct 1.0(w).

The comments to Georgia Rule 1.2 again provide helpful insight into the rule. The comments state in part:

[6] The scope of services to be provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client. When a lawyer has been retained by an insurer to represent an insured, for example, the representation may be limited to matters related to the insurance coverage. A limited representation may be appropriate because the client has limited objectives for the representation. In addition, the terms upon which representation is undertaken may exclude specific means that might otherwise be used to accomplish the client's objectives. Such limitations may exclude actions that the client thinks are too costly or that the lawyer regards as repugnant or imprudent.

[7] Although this rule affords the lawyer and the client substantial latitude to limit the representation, the limitation must be reasonable under the circumstances. If, for example, a client's objective is limited to securing general information about the law the client needs in order to handle a common and typically uncomplicated legal problem, the lawyer and client may agree that the lawyer's services will be limited to a brief telephone consultation. Such a limitation, however, would not be reasonable if the time allotted was not sufficient to yield advice upon which the client could rely. Although an agreement for a limited representation does not exempt a lawyer from the duty to provide competent representation, the limitation is a factor to be considered when determining the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. *See* Rule 1.1.[26]

---

[26] Georgia Rule 1.1, referenced in the above comment, is the rule that sets forth basic attorney competence. It states:

A lawyer shall provide competent representation to a client. Competent representation as used in this rule means that a lawyer shall not handle a matter which the lawyer knows or should know to be beyond the lawyer's level

[8] All agreements concerning a lawyer's representation of a client must accord with the Georgia Rules of Professional Conduct and other law. *See, e.g.,* Rules 1.1, 1.8 and 5.6.

*See* Ga. R. Pro. Conduct 1.2, cmt. 6, 7 & 8.

While a lawyer may limit representation of a client, a lawyer may not limit his or her representation in a manner that causes the lawyer to provide a service below this basic level of competence. Attorney Kakol violated this rule because he tried to limit his representation to the point that he provided no practical representation at all. The ministerial services he provided to Mr. Day were no more – perhaps even less – than a non-attorney bankruptcy petition preparer would have provided, but for a much larger fee and he gave Mr. Day the impression that he actually had a lawyer representing his interests when, in fact, he did not.

The Georgia Rules are not the only rules and procedures that attorneys practicing before this Court must follow if they wish to limit the representation of their clients. Pursuant to General Order 42-2020 (the "General Order"), this Court has also adopted its own rules with regard to how and whether attorneys may limit their representation of clients. *See Amended and Restated Order with Regard to Fees, Expenses and Costs of Attorneys for Debtors in Chapter 13 Cases,* General Order No. 42-2020 (Bankr. N.D. GA, January 6, 2021).[27]  The General Order

---

of competence without associating another lawyer who the original lawyer reasonably believes to be competent to handle the matter in question. Competence requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

[27] Future citations to the General Order will be shortened to simply "General Order."

states clearly and concisely that the "**[a]ttorney must represent Debtor in all matters**." *Id.* at 2 (emphasis added). It continues: "[a]ttorneys representing Debtors in Chapter 13 cases must represent the Debtor in all matters related to the case that affect the Debtor's interests unless the attorney is permitted to withdraw by order of the Court." *Id.* As the Court put it in *In re Egwim*, "[r]egardless of whether a valid limitation on services as between lawyer and client is established, however, the lawyer must represent the client until withdrawal is permitted." *In re Egwim*, 291 B.R. 559, 574-75 (Bankr. N.D. Ga. 2003). *Egwin* has been the standard of practice in this Court for more than 20 years.

The General Order directs any attorney wishing to limit his or her representation of a client to the Northern District of Georgia Bankruptcy Local Rules (the "Local Rules") pertaining to withdrawal from representation. Local Rule 9010-5 delineates, among other things, the rules for withdrawal from representation of a client in a case before this Court. Section (a) states the withdrawal policy as follows:

> An attorney who has appeared in a case or adversary proceeding, other than for the limited purpose of receiving notices, must obtain permission from the Bankruptcy Court to withdraw as counsel, unless substitute counsel has made an appearance for that party. Counsel may make a fee arrangement limiting the services to be performed without the payment of additional fees, but the failure of the client, including a debtor, to comply with the fee arrangement is merely a ground to seek withdrawal and not a basis on which the attorney may refuse to render services. Counsel will not ordinarily be allowed to withdraw if withdrawal would delay the progress of an adversary proceeding or contested matter.

*See* N.D. Ga. BLR 9010-5(a).

"Whether an attorney will be permitted to withdraw involves both procedural and substantive issues." *In re Egwim*, 291 B.R. 559, 575 (Bankr. N.D. Ga. 2003). Section (b) of Local Rule 9010-5 maps out the procedures that must be followed before an attorney is allowed to withdraw. That section states that an attorney desiring to withdraw as counsel must give fourteen days' notice to the client of the attorney's intention to request permission to withdraw and file a motion with the Bankruptcy Clerk requesting permission to withdraw, which the Bankruptcy Clerk will submit to the Bankruptcy Judge with any responses. *See* N.D. Ga. BLR 9010-5(b).

Section (c) of the Local Rule provides attorneys with an alternative set of procedures for withdrawal when a client consents. That section states that

> [a]n attorney wishing to withdraw may be relieved from the requirement to send a notice of intent to withdraw and to file a motion to withdraw by instead filing a Certificate of Consent with the Bankruptcy Clerk that has been signed by the client, the withdrawing attorney, and the substituting attorney, if one has been selected by the client.

*See* N.D. Ga. BLR 9010-5(c).

"An attorney desiring to limit the scope of an engagement has the burden of demonstrating compliance with all of the conditions required for the validity of the limitation." *In re Egwim*, 291 B.R. 559, 571 (Bankr. N.D. Ga. 2003). Aside from ensuring that attorneys follow the appropriate procedures, courts also "have an interest in the proper

59

administration of justice and in having parties before them properly represented." *Id.* at 576. "For this reason, courts have always limited the right of attorneys to withdraw from a case once they have appeared." *Id.* Court approval "involves considerations of fairness, reasonableness and proper protection of debtor's rights based on the circumstances in each case." *Id.* Moreover, "counsel cannot be permitted to initiate cases and then simply abandon debtors." *Id.*

Beginning with the Georgia Rules, Attorney Kakol's limitation of representation of Mr. Day to the mere filing of a skeletal bankruptcy petition was completely unreasonable. As comment 6 to Georgia Rule 1.2 makes clear "[a] limited representation may be appropriate because the client has limited objectives for the representation." Attorney Kakol argues that Mr. Day's sole objective was to prevent the foreclosure of his home. As noted above, that is not true. Mr. Day's objective was to keep his home. Attorney Kakol's limitation of representation actually almost prevented Mr. Day from achieving this objective. If not for Attorney Scott and Atlanta Legal Aid, it is entirely possible that Attorney Kakol's filing of chapter 13 cases under a "limited representation" could have provided CMNC with enough time to close the Sales Contract, present Mr. Day with a paltry $2,500—a loss of at least $80,000 if not upwards of $200,000 of equity—and left an 80-year-old widower in a wheelchair to find somewhere else to live. A limited representation cannot be reasonable when it does not achieve a client's goal. Being handed a mere $2,500 in exchange for $80,000 or more of equity and having to find a new home certainly was not Mr. Day's goal.

60

The late filed 2016(b) statements in these cases actually undercut Attorney Kakol's argument that his representation was limited to filing the petition. The amended 2016(b) statement in the First Day Case states that Attorney Kakol's $1,000 fee from Kyle Edwards on behalf of CMNC was in return for Attorney Kakol performing the following services:

Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;

Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;

Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;

Representation of the debtor in adversary proceedings and other contested bankruptcy matters;

Assisting client obtain pre-filing credit counseling; Assisting client obtain pay advices;

Assisting client obtain tax transcripts, returns, and other relative documentation;

Assisting in the preparation and completion of client's bankruptcy petition;

Preparing and filing changes of address;

Pre-confirmation turnover proceedings; Stop creditor actions against client;

Motion to Extend Stay or to Impose Stay;

Motion for Finding of Exigent Circumstances;

Obtaining Employment Deduction Order and serving employer;

Order to Vacate Employer Deduction Order;

Attending and representing client at the 341 Hearing and any reset hearings;

Attending and representing client at the Confirmation Hearing and any reset hearings;

Preparing and filing Modifications necessary to confirm client's plan;

Preparing and filing lien avoidances necessary to confirm client's plan;

Objections to claims necessary to confirm plan;

Objections to late filed claims;

Bar date review (and all resulting/related pleadings);

Provide information in obtaining pre-discharge financial counseling certificate;

Post-Confirmation amendment to add creditors;

Resolving Trustee or creditor motions to modify the plan.

See Amended Att'y Disclosure Stmt., *In re James Day (I)*, No. 22-59908 (Bankr. N.D. Ga. Dec. 15, 2023), ECF No. 19. The amended 2016(b) statement in the Second Day Case provides the same. (Amended Att'y Disclosure Stmt., ECF No. 34). Attorney Kakol did not perform any of these services. He testified that he instead limited his representation to avoid them, but if that was the case the 2016(b) statements should have reflected that.

Further, because Mr. Day qualified as an "assisted person" under 11 U.S.C. § 101(3), Attorney Kakol and his Law Firm acted as a "debt

relief agency" under 11 U.S.C. § 101(12A),[28] which means that a written attorney client agreement was required by the Bankruptcy Code. Section 528 of the Bankruptcy Code provides:

> "A debt relief agency shall - not later than 5 business days after the first date on which such agency provides any bankruptcy assistance services to an assisted person, but prior to such assisted person's petition under this title being filed, execute a written contract with such assisted person that explains clearly and conspicuously – the services such agency will provide to such assisted person; and the fees or charges for such services, and the terms of payment" and "provide the assisted person with a copy of the fully executed and completed contract."

See 11 U.S.C. § 528(a)(1)-(2).

An attorney client agreement would have clearly spelled out any limitations on the representation if such limitations actually existed, but Attorney Kakol failed to obtain a written agreement with Mr. Day as required by the Code.[29]

Attorney Kakol's view of his representation of Mr. Day was so limited—virtually non-existent—that it caused him to fail to discover that Mr. Day's actual goal was to keep his home, not just to stop the foreclosure. Discovering a client's goal in a representation must be

---

[28] An "assisted person" is defined as a person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $150,000. See 11 U.S.C. § 101(3). The term "debt relief agency" means any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration. . ." See 11 U.S.C. § 101(12A); see also Milavetz, Gallop & Milavetz, P.A. v. United States, 130 U.S. 1324, 1332 (2010) (attorneys are debt relief agencies when they provide qualifying services to assisted persons).

[29] As discussed below, § 527 also contains other required disclosures for debt relief agencies that were not made in this case.

included in the bare minimum of competence. As Georgia Rule 1.1 states "[c]ompetence requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." *See* Ga. R. Pro. Conduct 1.1. A limitation that excludes such minimal competence cannot be a reasonable limitation under any reasonable interpretation of the Georgia Rules. Attorney Kakol cannot limit his representation to the filing of a skeletal petition and ignore all other aspects of a client's case and financial circumstances, especially when doing so causes him to fail to even understand his client's goals. *See In re Egwim*, 291 B.R. 559, 576 (Bankr. N.D. Ga. 2003) (noting that "counsel cannot be permitted to initiate cases and then simply abandon debtors"); *see also In re Seare*, 493 B.R. 158, 188 (Bankr. D. Nev. 2013) ("The baseline obligation to inquire into the facts and circumstances of a case and analyze the possible legal issues is not changed when the scope of services is limited."); *In re Cuomo*, BK-S-10-14813-BAM, 2013 WL 3155425, at *8 (Bankr. D. Nev. June 20, 2013) ("To determine the client's objectives, a lawyer must properly communicate with the client to understand the client's expectations, learn about the client's particular legal and financial situation, and independently investigate any 'red flag' areas.").

Even if the alleged limitation in this case could have theoretically been reasonable, which it was not, Attorney Kakol failed to follow a single requirement for limiting the representation. He testified that he got Mr. Day's informed consent for this limitation during a "one-hour" phone call during which Kyle Edwards was present. Based on the Court's review of the witness testimony, both demeanor and the testimony itself, the Court

does not believe that any phone call with Mr. Day lasted one hour—or more than five or ten minutes—or that Attorney Kakol got any kind of informed consent from Mr. Day. Informed consent requires communication of "adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." *See* Ga. R. Pro. Conduct 1.0(h). Attorney Kakol failed to inform Mr. Day of alternatives that may have been available that could have helped him keep his home or sell it for more money. Had Attorney Kakol actually informed Mr. Day of alternatives that could have saved his home, Mr. Day almost certainly would have taken that course of action given that he had no interest in selling his home. Further, aside from Attorney Kakol's self-serving testimony, no evidence exists that shows that Mr. Day provided any consent to a limited representation. *See In re Mawson*, BT 18-05012, 2021 WL 4073376, at *6 (Bankr. W.D. Mich. Sept. 7, 2021) (finding that informed consent was not provided where the only evidence of limited scope was a 2016(b) statement and the attorney failed to offer any additional exhibits, such as a retainer agreement, to suggest that he ever discussed the limitations and failed to elicit any testimony from the debtor to establish that the debtor was aware of any alleged limitations on the representation). A written agreement on the scope of the representation with Mr. Day was required pursuant to § 528, but Attorney Kakol did not obtain one. Moreover, the 2016(b) statements do not show any type of limitation, either.

Attorney Kakol also completely ignored the General Order and this Court's procedure for a limited representation that requires withdrawal

from the case, which failure also makes this alleged limitation *per se* unreasonable. The General Order required Attorney Kakol to represent Mr. Day "in all matters," not only the one or ones Attorney Kakol picks and chooses. Had Attorney Kakol followed the procedures in the Local Rules and General Order, this Court would have received either a motion to withdraw or a certificate of consent immediately after the petition was filed. This would have been ***extremely*** unusual and possibly never seen before in this Court, which would have immediately sounded alarms and likely sparked some investigation by the Chapter 13 Trustee, the United States Trustee and the Court through an emergency status conference to inquire into what was going on. Instead, the effect of failing to follow these procedures was to obscure the supposed "limited representation" and avoid any scrutiny from the Court, the Chapter 13 Trustee, or United States Trustee. This is exactly what CMNC wanted because it allowed these cases to fly under the radar and avoid any scrutiny into the underlying facts, which would have revealed a situation where Mr. Day was not being adequately represented in bankruptcy proceedings.[30]

In sum, Attorney Kakol's "limited representation" violated Georgia Rule 1.2 because the limitation was unreasonable under the

---

[30] CMNC probably had to have a lawyer file this petition to give its scheme a cloak of legitimacy. CMNC could not prepare the petition for Mr. Day without making the necessary disclosures and satisfying the requirements for a petition preparer under 11 U.S.C. § 110. As part of that requirement, petition preparers must file a disclosure statement similar to the one required of attorneys under Rule 2016(b), except that petition preparers must file the statement disclosing the fee received on or behalf of the debtor with the petition, instead of 14 days after the petition. *Compare* Fed. R. Bankr. Pro. 2016(b) *with* 11 U.S.C. § 110(h)(2). Had CMNC hired a petition preparer to file the Day Bankruptcies, the details of CMNC paying the fees would have been immediately disclosed simultaneous with the filing of the petition, which would have raised a red flag to the United States Trustee, the Chapter 13 Trustee and the Court.

circumstances and Attorney Kakol failed to get his client's informed consent to the limitation. Further, Attorney Kakol failed to follow any of this Court's procedures for limiting representation found in the General Order and the Local Rules. As noted above, had Attorney Kakol followed the appropriate procedures, an investigation into the circumstances of this case would have ensued. Although the outcome of the investigation after a motion to withdraw here would likely have resulted in the termination of the representation, it would have been because of Attorney Kakol's conflict of interest, not because of any limitation on representation. Furthermore, the Court would have ensured that competent and independent counsel would have been retained to assist Mr. Day rather than Attorney Kakol because "considerations of fairness, reasonableness, and proper protection of debtor's rights" would not have been served by Attorney Kakol's continued representation of Mr. Day. *See In re Egwim*, 291 B.R. 559, 576 (Bankr. N.D. Ga. 2003). Basically, the Court would have intervened to protect Mr. Day because Attorney Kakol failed to do so.

### c. Failure to Follow Bankruptcy Code and Rules

Attorneys filing chapter 13 cases must also abide by certain rules and regulations and make various disclosures. For example, disclosure of the compensation arrangements of a bankruptcy professional is mandatory. *See* 11 U.S.C. § 329; Fed. R. Bankr. P. 2014, 2016, and 2017. Both 11 U.S.C. § 329(a) and Federal Rule of Bankruptcy Procedure 2016(b) mandate that an attorney file a statement disclosing facts and circumstances of the attorney's compensation in the case. Within 14 days

of filing the petition, attorneys must file a statement disclosing "the compensation paid or agreed to be paid . . ." within the previous year "for services rendered or to be rendered in contemplation of or in connection with the case by such attorney and the source of compensation . . . ." A debtor's attorney must "lay bare all its dealings . . . regarding compensation . . . . Counsel's fee revelations must be direct and comprehensive. Coy, or incomplete disclosures . . . are not sufficient." *In re Smitty's Truck Stop, Inc.*, 210 B.R. 844, 848 (10th Cir. BAP 1997) (quoting *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 880-881 (9th Cir.1995)).

Regardless of the source of payment and regardless of whether the attorney seeks payment from the estate or another source, the disclosures of fee arrangements must be full and complete. *See* 11 U.S.C. § 329(a); Fed. R. Bankr. P. 2016(b); *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 479 (6th Cir.1996). The precise nature of the fee arrangement must be disclosed, not merely the identity of the ultimate owner of the funds. *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 881 (9th Cir.1995) (citations and quotations omitted). Pursuant to the General Order, the 2016(b) statement must "...[d]escribe all fees, expenses and costs received before the filing of the case and the amounts and method of any future payments;... and [c]ertify that the attorney has provided the Debtor a copy of the 'Rights and Responsibilities.'" *See* General Order, p. 6. Attorney Kakol failed to comply with these provisions.

### 1. Attorney Kakol failed to comply with his obligation regarding the Rights and Responsibilities statement.

The statement of "Rights and Responsibilities" refers to a document that outlines various actions debtors and their attorneys must discuss and undertake before filing and during the pendency of a chapter 13 case. Pursuant to the "Rights and Responsibilities" statement, Attorneys representing chapter 13 debtors must undertake the following obligations prior to filing the petition:

- Personally counsel Debtor regarding the advisability of filing either a Chapter 13 or a Chapter 7 case, [and] discuss with Debtor the procedures in both Chapters, as well as nonbankruptcy options, and answer Debtor's questions.
- Personally explain to Debtor the requirement of obtaining a certificate from an approved nonprofit budget and credit counseling agency.
- Personally explain to Debtor that the attorney is being engaged to represent Debtor on all matters arising in the case and explain how and when the attorney's fees and the trustee's fees are determined and paid.
- Personally review with Debtor and obtain Debtor's signature on the completed petition, plan, as well as the Statement of Financial Affairs, Income and Expenses, and other statements as well as the various schedules (the "Schedules"), and all amendments thereto, whether filed with the petition or later.
- The Schedules may be prepared initially with the help of clerical or paralegal staff of the attorney's office, but personal attention of the attorney is required for the review and signing by Debtor.
- Timely prepare and file Debtor's petition, plan, Schedules, statement of monthly net income, and any other required pleading.
- Explain to Debtor how, when and where to make all necessary payments, including both payments that must be made

directly to creditors and payments that must be made to the
Chapter 13 Trustee, with particular attention to housing,
vehicle, and domestic support obligation payments.
- Advise Debtor of the need to maintain appropriate insurance
especially for house and vehicle. Inform Debtor of the need to
potentially provide attorney with copies of each Federal
income tax return (or transcript of the return) for each tax
year ending while the Debtor is in the case.

*See* General Order, Exhibit A.

Although Attorney Kakol testified that he went over the "Rights
and Responsibilities" statement with Mr. Day, when pressed on the
matter, he stated only that he discussed Mr. Day's goals in the case. He
may have discussed the goal of preventing the foreclosure but given the
fact that Attorney Kakol seemed unaware that Mr. Day did not want to
sell his home, it is apparent that any discussion of Mr. Day's goals was
not thorough or meaningful at all.

There is also no evidence that Attorney Kakol counseled Mr. Day
regarding the advisability of filing either a chapter 13 or a chapter 7
case.[31] There is no evidence that Attorney Kakol discussed with Mr. Day
the procedures in both Chapters, as well as nonbankruptcy options. In
fact, Attorney Kakol testified that he did not believe that there were any
nonbankruptcy options, so he did not have that discussion at all,
although Attorney Scott quickly found one and solved the problem
outside of the bankruptcy. Aside from Attorney Kakol's self-serving

---

[31] A Chapter 7 case would have thwarted CMNC's ability to acquire Mr. Day's home for less
than fair market value because a Chapter 7 trustee would have been tasked with selling the
property, assuming Mr. Day had any creditors, which we do not know because Attorney Kakol
never asked him about that.

testimony, there is no evidence that he explained to Mr. Day the requirement of obtaining a certificate from an approved nonprofit budget and credit counseling agency. In fact, Mr. Day did not personally complete the credit counseling in either case. Attorney Kakol certainly did not explain to Mr. Day that he was engaged to represent Mr. Day on all matters arising in the case. He testified himself that he did the opposite because he thought he could limit his representation.

### 2. Attorney Kakol failed to comply with the signature requirements for filing a petition.

The "Rights and Responsibilities" statement is not the only source outlining the importance of obtaining a debtor's signature. The Local Rules require an attorney to obtain and retain their client's original signature on verified papers, including a petition for relief, lists of creditors, and all documents required to be filed under Bankruptcy Rule 1007(b). *See* BLR 5005-7(c)(1); BLR 9001-1(o) (defining "Verified Paper"). Local Rule 5005-7(c)(1) specifically provides: "[a] person electronically filing a Verified Paper certifies that such filer has in such filer's possession at the time of filing the fully executed original Verified Paper with an original signature of each person whose signature is indicated thereon." BLR 5005-7(c)(1). As the Court noted in *In re Brown*:

> General Order 38-2020 explains an original signature
> includes a signature created by placing an ink pen on paper
> (a wet ink signature), a signature obtained through an e-
> signing and digital management software application that
> provides for an audit trail (such as DocuSign, PandaDoc, or
> AdobeSign), or a signature delivered to the filer by the
> signatory in an image format through email. General Order
> 38-2020 further provides the failure to comply with the

procedures found in BLR 5005-7 "may result in the Court ordering a suspension or limitation ... of the filing of cases in this Court."

*In re Brown*, 21-57056-WLH, 2023 WL 4501933, at *4 (Bankr. N.D. Ga. July 12, 2023).

"The purpose of having the debtor's signature on the petition is to affirm that the information contained in the petition is true and correct." *Id.* at *5 (citing *In re Alvarado*, 363 B.R. 484, 491 (Bankr. E.D. Va. 2007)". Filing a petition without the debtor's verification also violates Bankruptcy Rule 1008 and sometimes "amounts to fraud." *Id.*; *see also* Fed. R. Bankr. P. 1008 ("All petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746.").

In addition to the improprieties with respect to the signatures in the First Day Case, where Ms. Williams signed the petition on behalf of Mr. Day without proper authorization, another glaring procedural and ethical error on the part of Attorney Kakol is the failure to obtain a valid signature in the Second Day Case. There is no signature certificate; Mr. Day testified that he did not sign the petition; Anthony Day testified that he did not sign it; and Ms. Matthews, who signed the petition in the First Day Case, also testified that she did not sign it. No evidence was presented, timely or otherwise, to show any of them signed it or authorized it. But Attorney Kakol filed it anyway. This is no mere "technical error." Obtaining consent and a signature from a debtor before putting him into bankruptcy is a hallmark of filing a case. There is no evidence that was done here. Attorney Kakol's failure to obtain and

retain Mr. Day's signature on the petition in the Second Day Case
constituted a clear violation of both BLR 5005-7(c)(1) and General Order
38-2020.[32]

Further, the only evidence that anyone authorized the filing of the
petition in the Second Day Case was Attorney Kakol's self-serving
testimony. In the face of the credible testimony from Mr. Day, Anthony
Day, and Ms. Matthews, the Court finds it likely that no one authorized
Attorney Kakol to file the petition in the Second Day Case other than
Kyle Edwards. As the Court in *In re Brown* noted, knowingly filing a
bankruptcy petition without client verification may violate Georgia Rule
3.3. *See In re Brown*, 21-57056-WLH, 2023 WL 4501933, at *7 (Bankr.
N.D. Ga. July 12, 2023) (citing *In re Minsk*, 296 Ga. 152, 153 (2014). In
that case, the Court held that even though the attorney failed to obtain a
debtor's original signature, Georgia Rule 3.3 was not violated because
evidence supported the conclusion that the debtor had authorized the
filing. *See Id.* at *8 (debtor testified that she recalled authorizing her
attorney to file something, though she could not recall what). In this case,
however, there is no evidence that Mr. Day or anyone on his behalf
authorized Attorney Kakol to file the petition in the Second Day Case.
Because Attorney Kakol filed the petition in the Second Day Case
without obtaining a valid signature and because the evidence does not

---

[32] Recall that in Attorney Kakol's Surresponse where he attempted to supplement the
evidentiary record with phone and text communications that none of the phone and text
communications occurred around the filing of the Second Day Case in March of 2023. Thus,
Attorney Kakol's own phone and text records, if admitted timely and appropriately at the
Hearing, would have further proven his failures to communicate with Mr. Day or Mr. Day's
family and to ensure that the petition in the Second Day Case was signed by anyone at all.

support a conclusion that anyone authorized Attorney Kakol to file the petition in the Second Day Case other than Kyle Edwards, the Court finds that Attorney Kakol knowingly filed the petition without client authorization in violation of Georgia Rule 3.3.

Furthermore, the evidence showed that Attorney Kakol's Law Firm had Ms. Williams sign numerous documents in blank that are required to be signed under penalty of perjury. How can this Court have any confidence that this is not a common practice by Attorney Kakol's Law Firm, to get such documents signed in blank and then fill them out later? Regardless of whether the information put in the document is ultimately correct, it is a completely unacceptable practice.

### 3. Attorney Kakol failed to comply with §§ 527 and 528 of the Code.

As noted above, this case also required further disclosures under § 527 given that Mr. Day qualified as an "assisted person" under the Code, and Attorney Kakol's Law Firm qualified as a "debt relief agency". In addition to obtaining the required attorney client agreement, debt relief agencies must provide to their clients notice containing "a brief description of chapters 7, 11, 12, and 13, and the general purpose, benefits, and costs of proceeding under each of those chapters, and the types of services available from credit counseling agencies." *See* 11 U.S.C. § 527(a)(1); 11 U.S.C. § 342(b)(1). § 527 also requires debt relief agencies to provide notice to assisted persons regarding the importance of accurate and complete disclosures of information provided in the petition and other filings in a bankruptcy case. *See* 11 U.S.C. § 527(a)(2). Debt relief

74

agencies must maintain a copy of the notices required under subsection (a) for two years.  11 U.S.C. § 527(d). § 527(b) further provides that debt relief agencies must provide assisted persons with a statement that outlines information about the services an attorney in bankruptcy provides. *See* 11 U.S.C. § 527(b).  The suggested statement contains the following language in all capital letters: "The law requires an attorney or bankruptcy petition preparer to give you a written contract specifying what the attorney or bankruptcy petition preparer will do for you and how much it will cost." *Id.* The suggested statement also says: "Before filing a bankruptcy case, either you or your attorney should analyze your eligibility for different forms of debt relief available under the Bankruptcy Code and which form of relief is most likely to be beneficial for you." *Id.*

Perhaps most importantly, Attorney Kakol failed to obtain a lawyer-client agreement or any kind of contract with Mr. Day despite the clear requirements of the Code. He also failed to provide Mr. Day with any of the notices outlined in § 527 describing the different purposes and benefits of different chapter of the code, the importance of including accurate information in bankruptcy filings, and the information about services a bankruptcy attorney is supposed to provide. Because Attorney Kakol failed to provide Mr. Day with any of these notices, he also failed to maintain copies for his records, and his case files for the Day Bankruptcies did not contain copies of any of these required notices.

75

### 4. Attorney Kakol intentionally failed to timely, properly, and accurately file Rule 2016(b) statements.

An attorney who fails to make required disclosures or makes disclosures containing false information risks running afoul of the Georgia Rules. Georgia Rule 3.3 relates to a lawyer's duty of candor to the tribunal. That rule states in part that "[a] lawyer shall not knowingly make a false statement of material fact or law to a tribunal." *See* Ga. R. Pro. Conduct 3.3(a). The comments instruct that the rule "sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process" and [t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." *See* Ga. R. Pro. Conduct 3.3, cmt 2 & 3. Submission of a sworn statement containing false information violates the duty of candor. *In re Branan*, 300 Ga. 779, 779 (2017). Courts have also held that knowingly filing a bankruptcy petition and associated statement of financial affairs without the client's verification violates Rule 3.3. *See In re Minsk*, 296 Ga. 152, 153 (2014).

As noted above, Attorney Kakol failed to file 2016(b) statements until well after the United States Trustee began investigating his conduct in these cases. Again, the effect of doing this was to obscure the fact that payment in these cases came from a third party other than the debtor. Attorney Kakol testified that the failure to file the 2016(b) statements was the result of a software error, but it was his job to ensure that all of the proper procedures were followed in filing these chapter 13 cases. Failing to file these 2016(b) statements effectively misrepresented the circumstances of these cases to the Court, in violation of Georgia Rule

76

3.3. But the facts of this case show the Court that this was not a "software error" or a mistake unique to this case because the failure occurred in most if not all of the other cases with similar facts involving CMNC paying Attorney Kakol's fees. It is obvious to the Court that Attorney Kakol's failure to timely, properly, and accurately file the rule 2016(b) statement was intentional as part of the effort to conceal from the Court the disturbing facts of this case and the scheme involving CMNC and Attorney Kakol and his Law Firm.

As noted above, the 2016(b) statements that Attorney Kakol eventually did file well after the due date – and only in response to the UST Motion - outline that Attorney Kakol received his fee in return for providing a litany of standard services to debtors that Attorney Kakol did not perform. Further, according to his own testimony, Attorney Kakol intended to limit his representation to avoid having to provide almost all, if not all, of the services listed in the late filed 2016(b) statements. This makes the late filed 2016(b) statements knowingly false statements made to this tribunal in violation of Georgia Rule 3.3. *See* Ga. R. Pro. Conduct 3.3. In this instance, Attorney Kakol exhibited a clear disregard for "the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process." *See Id.*, cmt. 2.

## V.   Disciplinary Sanctions

The bankruptcy process was abused in this case. And Mr. Day—whose home and well-being were at stake—was reduced to a mere element in a financial transaction, a shameful opportunity for an investor and lawyers to make a buck at his expense, rather than see him as an

opportunity for compassion and to assist an elderly gentleman who only needed a little help. The purpose of a debtor filing a petition for bankruptcy relief under Chapter 13 is to obtain the benefits of the automatic stay in order to reorganize debts to retain property or sell property in a reasonable manner to realize its fair market value for the benefit of the debtor and his creditors. A bankruptcy petition should never be filed to invoke the automatic stay merely to stop a foreclosure and do nothing else so that the case can get quickly dismissed for the sole purpose of buying time for a purchaser – who selected and paid the debtor's lawyer – to acquire the debtor's home at a fire sale price, costing the debtor $80,000 or more of equity and leaving him with no place to live. [33] A debtor's lawyer should zealously protect a client's equity in a home. The idea of participating in a scheme to divest a client of equity in a home for next to nothing should make any debtor's lawyer nauseous.

The Court has the inherent power, "incidental to all courts" to "discipline attorneys who appear before it." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). This inherent power includes the power to suspend or disbar attorneys from practicing before the court. *In re Snyder*, 472 U.S. 634 (1985); *In re Mattinson*, 2010 WL 4102293, at *3 (Bankr. N.D. Ga. Oct. 1, 2010). Additionally, the Bankruptcy Code authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Code." *Law v. Siegel*, 571 U.S. 415, 420-21 (2014) (citing 11 U.S.C. § 105(a)). *In*

---

[33] Not to mention possibly damaging the debtor's credit rating by filing a bankruptcy case that may not have been necessary.

*re Reeves*, 372 B.R. 525, 528 (Bankr. N.D. Ga. 2007).

Attorney Kakol's conduct in this case cannot be considered in a vacuum. Indeed, Attorney Kakol has a long disciplinary record with both the State Bar of Georgia and this Court. That record is summarized below.[34]

### A. Discipline by the State Bar of Georgia

The State Bar of Georgia has disciplined Attorney Kakol in the past multiple times, including by suspending him from practice for three years. In May 1997, Attorney Kakol was suspended from practice until further order of the Georgia Supreme Court for failure to adequately respond to the State Bar of Georgia's Notice of Investigation, in which the maximum sanction for the violations therein was disbarment. He thereafter adequately responded and was reinstated in July 1997. *See In re Kakol*, No. S97Y1236 (filed with the State Bar of Ga. May 1997).

Shortly thereafter, in January 1998, the Georgia Supreme Court accepted Attorney Kakol's petition for voluntary discipline and suspended him for three years in resolution of nine disciplinary matters pending against him in two separate notices of discipline. Attorney Kakol admitted to violating Standards 22 (failure to properly withdraw from employment on discharge by client); 44 (willful abandonment or disregard of a client's legal matter); 61 (failure to promptly notify a client

---

[34] Some of this disciplinary history has been previously mentioned in footnotes throughout this Order in connection with certain failures made by Attorney Kakol in the Day Bankruptcies. *See, e.g., supra*, footnotes 2, 5, 9, and 16. Attorney Kakol's disciplinary history has been repeated here, but with more detail than mentioned in prior footnotes to show a more complete record.

of the receipt of client funds or property and to promptly deliver the funds or property to the client); 63 (failure to maintain complete records of client); and 65 (commingling of client funds with those of the lawyer) of Bar Rule 4-102 (d). In some or all of the nine pending disciplinary matters from those cases, Attorney Kakol agreed to represent clients and then did not take appropriate action in their cases, including failing to file lawsuits or settle cases, failing to appear in court or notify the client of court dates thus permitting the statute of limitations to expire and cases to be dismissed; failing to return client files upon request; failing to promptly deliver settlement proceeds to a client; presenting checks from his escrow account against insufficient funds; and using his escrow account as his personal checking account. *See In re Kakol*, 268 Ga. 854 (1998).

Next, in 2010, Kakol was further disciplined by the Georgia Supreme Court for failing to have an escrow account, which discipline consisted of a Review Panel reprimand in accordance with Bar Rules 4-102 (b) (4) and 4-220, and with various conditions strictly limiting Attorney Kakol's practice for two years.[35] This discipline was the result of this Court's decision in *In re Willis*, 06-61285-JB, 2007 WL 7140150 (Bankr. N.D. Ga. Aug. 29, 2007) in which Judge Bihary's sanctions included limiting Attorney Kakol to filing no more than 2 cases per month for 18 months. In that Georgia Supreme Court Order, there is also a

---

[35] Kakol had closed his practice at this time and became an associate at another firm where he had no managerial responsibility. He was required to remain an associate at this firm for 24 months, but was precluded from signing and filing pleadings, and appearing at hearings, among many other restrictions.

reference to a 1984 public reprimand and a letter of admonition in 2007. *See In re Kakol*, 286 Ga. 469 (2010).

## B. Discipline by the Bankruptcy Court for the Northern District of Georgia

The Bankruptcy Court for the Northern District of Georgia has frequently sanctioned Attorney Kakol. A sample of such cases follows with particularly applicable portions highlighted:[36]

### In re Chrisea Moring, Case No. 23-56182-BEM

- Facts: ***Attorney Kakol did not provide Debtor with a copy of the Rights and Responsibilities Statement as required by the General Order.*** At the 341 meeting of creditors, the Debtor testified that she had not met with an attorney since the case was filed and only met with support staff to answer questions she had regarding her case, potentially including legal questions, despite the fact that the Chapter 13 Trustee had specifically asked Attorney Kakol to meet with Debtor to discuss her rights and responsibilities. The meeting of creditors also revealed undisclosed debts and undisclosed assets and of the debtor.
- Disposition: Case Dismissed, and any unpaid attorney fees were disallowed unless upon further order of the Court.

### In re Emeka Nwosu, Case No. 23-55213-JWC

- Facts: ***Attorney Kakol and Attorney Kakol's Law Firm failed to properly confirm Debtor's identification and failed to conduct a proper inquiry into Debtor's financial affairs prior to filing the bankruptcy case.***
- Disposition: The attorney fees were reduced to $357.50, and Attorney Kakol and Attorney Kakol's Law Firm were required to develop and implement procedures to ensure the firm properly

---

[36] Other orders exist which disallow or reduce fees for various violations of duties and failures to properly represent his clients.

verifies the identity of the firm's clients prior to the filing of a bankruptcy case, including: processes by which the firm will collect photo identification and proof of social security number from each client prior to filing a bankruptcy case; ensure that an attorney with the firm reviews the identification documentation received from the client prior to filing a bankruptcy case for accuracy and authenticity; and compares the identification document to the information included on the voluntary petition.

*In re Keyanna Kesha Nelson*, Case No. 23-50126-LRC

- Facts: Attorney Kakol failed to appear for a hearing on Debtor's Motion to Impose Stay, which Attorney Kakol's Law Firm scheduled.
- Disposition: Attorney Kakol's fee was reduced by $500.

*In re David George DaCosta*, Case No. 22-59912-SMS[37]

- Facts: Attorney Kakol failed to timely move to extend the automatic stay as required by the Code since it was the debtor's second chapter 13 case in one year, filed a chapter 13 plan with the incorrect case number, and failed to object to creditor claims. Further, *the debtor sought sanctions against Attorney Kakol related to Attorney Kakol's failure to communicate with the debtor, his failure to properly represent the debtor,* and his $5,200 fee in the case. At the show cause hearing on the debtor's request for sanctions, *the Court discovered that Attorney Kakol also required the debtor to submit a $1,000 payment to show "good faith" to the Court that the debtor had the funds to complete a chapter 13 case,* but that Attorney Kakol kept his money for himself. According to the Court, Attorney Kakol also "disparaged the debtor's mental health" despite warnings from the Court. *The Court also found that Attorney Kakol violated Georgia Rule 1.2(c) by limiting the scope of his*

---

[37] The opinion in this case was published at: *In re DaCosta*, 22-59912-SMS, 2024 WL 422779 (Bankr. N.D. Ga. Feb. 5, 2024).

*representation with respect to a creditor claim without Debtor's informed consent.*

- Disposition: Attorney Kakol was ordered to pay a $2,500 sanction and his $5,200 attorney's fee to the debtor.

<u>In re Temeka Narisse White</u>, Case No. 22-58566-PMB

Facts: Attorney Kakol failed to disclose a personal injury action when he filed the case, failed to seek employment of special counsel, and also allowed settlement proceeds to be paid to special counsel without approval of the Court.

- Disposition: Attorney fees were reduced by $1,000, and Attorney Kakol was ordered to implement procedures by which the firm will thoroughly counsel debtors regarding their continuing duty to: disclose all claims and causes of action; timely identify and schedule all claims and causes of action; promptly seek approval for employment of professionals, with a properly detailed application and verified statement of the professional; serve retention applications and orders on employed professionals; properly counsel debtors, and instruct professionals regarding restrictions and requirements for settlements and disbursement of proceeds; periodically communicate with debtors and professionals to monitor their conduct; obtain necessary documents and information; prepare, file, and serve pleadings that adequately set forth material terms for approval of settlements, compensation of professionals, and disbursement of proceeds; serve professionals with pertinent orders; and timely and fully communicate and cooperate with the trustee serving in the case.

<u>In re Tommy LeWayne Leach</u>, Case No. 22-51217-SMS

- Facts: Attorney Kakol filed a motion to impose the stay, which was granted, but then waited three weeks to upload the order, so the debtor's car was repossessed. Attorney Kakol also failed to familiarize himself with the facts of the repossession prior to a hearing for turnover and it was unclear when the car was repossessed. The Court granted turnover of the vehicle, but Attorney Kakol again failed to timely upload an order.

83

- Disposition: Attorney Kakol's fees were disallowed.

## *In re Frederick Phillips*, Case No. 22-50660-BEM

- Facts: Attorney Kakol converted a case from chapter 13 to chapter 7 despite the debtor being ineligible for a chapter 7 discharge.
- Disposition: Attorney Kakol removed as counsel and case dismissed.

## *In re Sedric Ross*, Case No. 20-60176-LRC

- Facts: Attorney Kakol secured a limited imposition of the stay to a date certain when a hearing would be held; however, Attorney ***Kakol submitted a proposed order granting the imposition of the stay, without restriction or notice of a hearing and signed opposing counsel's signature to the proposed order without permission.***
- Disposition: Attorney Kakol's fee was reduced to $4,000 and, for a period of 12 months, Kakol was required to attach to any proposed order written permission from opposing counsel along with the signature.

## *In re Neil Duelen*, Case No. 19-69877-PMB

- Facts: ***Attorney Kakol failed to go over the Rights and Responsibilities Statement with Debtors, failed to meet with and obtain original signatures on the verifications, and did not timely execute a contract with the Debtors.***
- Disposition: Attorney Kakol's fees were disallowed in their entirety, and in all active cases pending in the Northern District of Georgia as of March 5, 2020, where he was listed as counsel of record, Attorney Kakol was required to, by April 30, 2020, review with his clients all Verified Papers filed in each case, obtain the client's signature on the papers, and certify to the Court that the documents had been signed and were accurate or, if errors and omissions were discovered, prepare and file corrected Verified Papers, signed by the debtors. For a period of 12 months Attorney Kakol was also required to attach wet ink signatures of the debtor

for all signed papers, and for a period of 3 months, Kakol was limited to filing no more than 15 chapter 13 cases per month.

*In re Kadesha Grey*, Case No. 15-52337-MHM

- Facts: After a failure to pay the full filing fee, Attorney Kakol filed a motion to vacate dismissal (even though vacating the dismissal would not impose the stay) and then failed to prosecute the motion.
- Disposition: Attorney Kakol was required to obtain, within six months, two hours each of continuing legal education on ethics and professionalism.

*In re Larry Black*, Case No. 07-74822-CRM

- Facts: Attorney Kakol filed a motion to reconsider on behalf of the debtor despite not having been the attorney of record in the case previously. ***Attorney Kakol did not file the required disclosure statements pursuant to Rule 2016(b) even though he admitted to accepting $1,000 from the debtor prior to his appearance.*** Attorney Kakol admitted to holding the funds in his firm's operating account rather than in an escrow account or in a trust.
- Disposition: Unknown or none; no written order entered.

*In re Patricia A. Coard-Seabrooks*, Case No. 07-70014-JEM

- Facts: Attorney Kakol received $4,500 for a bankruptcy case with only one creditor paid through the chapter 13 plan, which the Court found to be a high fee. The Chapter 13 Trustee also reported not receiving payments from the debtor timely on the required schedule, but instead in lump sums. Judge Massey wanted to know what Kakol was doing to earn his fee in a one creditor case under the circumstances.
- Disposition: Unknown or none; hearing held to evaluate Attorney Kakol's fee, but no written order entered; the law firm of Clark and Washington was substituted in as counsel.

<u>In re Bobby Lee Robinson</u>, Case No. 07-68960-MHM[38]

- Facts: Attorney Kakol Failed to appear at a hearing on an objection to claim that he had filed.
- Disposition: Attorney Kakol was ordered to remit $200 to the trustee.

<u>In re Deborah Williams</u>, Case No. 07-68540-MHM[39]

- Facts: ***Attorney Kakol failed to file a Rule 2016(b) statement, failed to file the required documents before the 341 meeting and failed to seek additional time to do so.*** Attorney Kakol failed to ensure that his client appeared at the 341 meeting.[40] Attorney Kakol also filed motions to extend the stay without performing his duties or his client's duties.
- Disposition: Sanctions deferred, but never imposed. The Chapter 13 Trustee was directed to monitor cases Attorney Kakol was involved in.

<u>In re Leroy Hill</u>, Case No. 07-67074-CRM

- ***Attorney Kakol prepared and filed a chapter 13 petition for the debtor, Leroy Hill, signed by his son, Tyrone Hill, without proof of the son's legal right to sign on behalf of his father. Attorney Kakol also failed to timely file an accurate Bankruptcy Rule 2016(b) Disclosure Statement; failed to timely file the Debtor's schedules I and J; and knowingly made false oaths in relation to the case.*** Attorney Kakol also prepared a bankruptcy case under chapter 13 that was filed in Maryland for the same debtor at the same time as this case.

---

[38] The opinion in this case was published at: *In re Robinson*, 07-68960-MHM, 2008 WL 7842094 (Bankr. N.D. Ga. Apr. 3, 2008).

[39] The opinion in this case was published at: *In re Williams*, BKR. 07-68540-MHM, 2007 WL 7141823 (Bankr. N.D. Ga. Sept. 7, 2007).

[40] The Motion for Show Cause Order identified three other cases with similar issues involving with five total debtors. None of the five debtors appeared at their 341 meetings. *See* Motion for Ord. to Show Cause, *In re Williams*, No. 07-68540-MHM (Bankr. N.D. Ga. July 16, 2007), ECF No. 25.

- Disposition: Attorney Kakol was required to pay back the filing fee for Maryland case. Attorney Kakol advised the Court that he had closed his law practice and that he had transferred all cases to other firms. No additional sanctions were imposed.

*In re Kimberley Smith*, Case No. 06-62445-JEM

- Facts: **Attorney Kakol failed to file complete schedules, statements of financial affairs, and required disclosure statements.** The Court identified twenty other cases filed by Attorney Kakol since September 2005, in which he also failed to file complete schedules, statements of financial affairs, and required disclosure statements. The Court also identified another thirty-five cases where Attorney Kakol filed schedules and statements of financial affairs for his clients some fifty-three days on average beyond the deadline of fifteen days after the petition date.
- Disposition: Attorney Kakol was suspended from filing cases for 6 months.

*In re Patricia Willis*, Case No. 06-61285-JB[41]

- Facts: **Attorney Kakol failed to file the Rule 2016(b) statement. The Court issued an Order of Sanctions in response to the Chapter 13 Trustee's Motion for Sanctions for Attorney Kakol's repeated failure to file the Rule 2016(b) statements.[42]** The Court also expressed concern about Attorney Kakol's lack of an escrow account, his "all cash" law practice, and his repeated failure to disclose fees.
- Disposition: Attorney Kakol was required to complete (1) six hours of continuing legal education on consumer bankruptcy law, (2) six hours of continuing legal education on ethics, (3) a consultation with the State Bar of Georgia on Law Firm Management, and (4) to

---

[41] The opinion in this case was published at: *In re Willis*, 06-61285-JB, 2007 WL 7140150 (Bankr. N.D. Ga. Aug. 29, 2007).

[42] *See* Ord. Regarding Tr.'s Motion for Att'y Stanley J. Kakol to Show Cause, *In re Patricia Willis*, No 06-61285 (Bankr. N.D. Ga. Aug. 29, 2007), ECF No. 75.

refrain from filing more than two cases per month for eighteen months.

_In re Sandra Hunter_, Case No. 05-84124-JEM

- Facts: ***Attorney Kakol and another attorney filled out a petition and took no further action for a fee of $1,500.***
- Disposition: Attorney Kakol was required to return all fees received, and the Court imposed a $250 sanction on Attorney Kakol payable to the Court.

_In re Derrick Williams_, Case No. 04-98641-MHM; _In re Jake Shields_, Case No. 04-98620-MHM; and _In re Belinda Hearn_, Case No. 04-98293-MHM

- Facts: ***Attorney Kakol Failed to properly represent each of the three clients in these cases.***
- Disposition: The Court dismissed all 3 cases, and Attorney Kakol was required to disgorge all fees and to prepare and file new cases for each of the debtors and to pay the filing fees for each.

In reviewing this long history of discipline from this Court and the State Bar of Georgia, the Court notes it continues to see the same violations again and again – violations regarding 2016(b) statements, unverified signatures, inadequate representation, sloppy practice and procedures – each of which was manifest in this case. It does not appear that the prior discipline ordered by judges of this Court has been effective in remedying this type of misconduct. Attorney Kakol either does not get it, cannot get it or does not care to get it with respect to the repeated violations of the same type of conduct. That inability or lack of desire to adhere to the standards of practice and procedure time after time – for almost 20 years – alone necessitates a stronger sanction than what he has received in the past, which past sanctions from this Court have

included a six-month prohibition on filing any new cases in this District and another time a limit of two new cases a month for 18 months.

The violations of the Georgia Rules of Professional Conduct found in this case, however, are of a different nature than Attorney Kakol's prior misconduct before this Court. Attorney Kakol was directly adverse to Mr. Day because his actions in this case were designed to advance the interests of CMNC, his true client, rather than those of Mr. Day. As discussed above, this is a gross violation of the Georgia Rules of Professional Conduct. Mr. Day needed the help of a lawyer to save his home, but instead he was treated by Attorney Kakol as a mere financial transaction, a means to an end, a chance to earn $1,000 so his true client, CMNC could reap a huge profit from the purchase and sale of Mr. Day's home and perhaps Attorney Kakol would get some more business down the road.

And we know that business did come and Attorney Kakol has acknowledged that. The United States Trustee has alleged that in nine of the cases for other debtors for whom Attorney Kakol filed bankruptcy petitions while being paid by CMNC those debtors have lost more than $1,234,000 of equity in their properties based on information available on the public record. And the United States Trustee alleges that there are other debtors who may also have lost equity in similar situations. Those other cases are the subject of the Miscellaneous Proceeding. The Court will have to await the outcome of that Miscellaneous Proceeding to determine the facts, whether there were violations of the Georgia Rules, the Bankruptcy Code and Rules, and this Court's Local Rules and

89

General Orders, and whether any additional sanctions are appropriate if such violations occurred.

After considering the numerous violations of the Georgia Rules of Professional Conduct, the Bankruptcy Code, the Bankruptcy Rules and this Court's General Order and Local Rules in this case, and repeated similar violations on the part of Attorney Kakol over the last 20 years in this Court, the Court finds that the appropriate disciplinary sanction for this case is that Attorney Kakol and Attorney Kakol's Law Firm shall be prohibited from filing any new bankruptcy cases in the Northern District of Georgia for a period of twelve months from the entry of this Order except that the prohibition shall be permanent with respect to cases in which Attorney Kakol and Attorney Kakol's Law Firm would be paid by third parties. This prohibition will commence on April 11, 2024, except that it shall go into effect immediately with respect to any cases in which Attorney Kakol or Attorney Kakol's Law Firm would be paid by a third party.

The findings of fact, conclusions of law and disciplinary sanction in this Order have been presented to all of the active bankruptcy judges in the Northern District of Georgia at a regularly scheduled monthly meeting of the active bankruptcy judges in this District. At that meeting the judges unanimously voted to adopt this Order and the discipline imposed herein on Attorney Kakol and Attorney Kakol's Law Firm.

## VI.  Conclusion

Accordingly, it is hereby

**ORDERED** that Attorney Kakol and Attorney Kakol's Law Firm are prohibited from filing any new bankruptcy cases in the Northern District of Georgia for a period of twelve months from the entry of this Order except that the prohibition shall be permanent with respect to cases in which Attorney Kakol and Attorney Kakol's Law Firm would be paid by third parties. This prohibition will commence on April 11, 2024, except that it shall go into effect immediately with respect to any cases in which the fees and costs would be paid by a third party.

The Clerk is directed to serve a copy of this Order on the Respondents, the United States Trustee, the Chapter 13 Trustee and the Debtor.

**END OF ORDER**

This Order has been adopted as an Order of
the entire Court for this District at a regular
meeting of all the active bankruptcy judges
in this District.

For the Court:

Barbara Ellis-Monro
Chief Judge
United States Bankruptcy Court
for the Northern District of Georgia